

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. AP-77,038

**US CARNELL PETETAN, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

ON DIRECT APPEAL
FROM CAUSE NO. 2012-2331-C1
IN THE 19TH DISTRICT COURT
McLENNAN COUNTY

**KELLER, P.J., delivered the opinion of the Court in which KEASLER, HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, and WALKER, JJ., joined. ALCALA, J., filed a dissenting opinion.**

Appellant was charged with the capital murder of his wife, Kimberly Petetan. The indictment alleged that he intentionally caused her death during the course of committing or attempting to commit the offenses of burglary, kidnapping (of Kimberly or her daughter A.W.), and retaliation.[1]

---

[1] *See* TEX. PENAL CODE § 19.03(a)(2) ("A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder

A jury found appellant guilty of capital murder and answered the special issues in such a manner that appellant was sentenced to death. Appeal to this court is automatic.[2] Appellant raises thirty points of error. We modify the judgment to reflect that appellant was convicted of a capital felony and otherwise affirm.

## I. SUFFICIENCY OF THE EVIDENCE – GUILT

In point of error six, appellant contends that the evidence was insufficient to prove that he "murdered the complainant while in the course of committing or attempting to commit the offenses of burglary, kidnapping, or retaliation."

### A. Standard of Review

In conducting a sufficiency review with respect to a defendant's guilt, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.[3] "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination."[4]

### B. The Evidence

Viewed in the light most favorable to the verdict, the evidence shows the following: Kimberly had been married twice and had three children (including a now-adult daughter named

---

in the course of committing or attempting to commit kidnapping, burglary, . . . [or] retaliation.").

[2] TEX. CODE CRIM. PROC. art. 37.071, §2(h).

[3] *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016).

[4] *Blea*, 483 S.W.3d at 33 (quoting *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014)).

Kristen) before she entered into a relationship that ended because the couple became addicted to crack cocaine. During this relationship, Kimberly had a fourth child, a daughter we shall call "A.W."[5] With the help of a treatment center, Kimberly overcame her addiction, and she felt that God had saved her and had called her to share her testimony. In 2009, Kimberly met appellant's brother at an auto repair shop, and she shared her recovery story. Appellant's brother suggested that Kimberly contact appellant, who was in prison, because her story might be inspiring for him. Kimberly became pen pals with appellant, and their correspondence developed into a romance that culminated in marriage by proxy in 2010.

In the spring of 2012, appellant first began living with Kimberly in her apartment in Waco. Almost immediately, the couple began having arguments and fights, which resulted in the police being called. Kimberly considered divorce, but she and appellant reconciled. During the time that he lived with her in Waco, appellant would often get angry and tell Nichlos Lampkin (a casual acquaintance), "Man, I'm going to kill that bitch." Appellant made a similar statement to Morris Evans, Lampkin's brother-in-law.

In August 2012, Kimberly and appellant had a falling out. Appellant moved to Port Arthur, and Kimberly moved to a different apartment in Waco. The next month, Kimberly moved in with appellant in Port Arthur, but she kept her apartment in Waco in case things did not work out.

On September 13, 2012, appellant, Kimberly, and A.W. were at a rap studio. The smoking at the studio bothered Kimberly, and she asked appellant to take her and A.W. back to his apartment. An argument ensued, but eventually, appellant reluctantly agreed to do so. When appellant began smoking inside the apartment, Kimberly asked him to smoke outside because A.W. had asthma.

---

[5] A.W. was eleven years old at the time of trial in 2014.

Becoming angry, appellant pushed Kimberly onto a couch and caused her to fall onto the ground. When Kimberly got up, appellant pushed her into some boxes. Kimberly tried to leave, but appellant pushed her up against a wall. She fell, and appellant grabbed a large kitchen knife. Holding the knife close to Kimberly, he said, "I could kill you, I could kill you. Do you want to die in front of [A.W.] tonight?" Kimberly tried to call the police, but appellant took the phone away. Kimberly then ran to the bathroom and used a phone in there to call 9-1-1. While Kimberly was in the bathroom, appellant cut himself in the stomach with the knife, called the police, and then left.

That night, Port Arthur Police Officer Ryan Kidwell received a dispatch about a possible assault at appellant's apartment. Upon arriving at the apartment, Officer Kidwell spoke with Kimberly, who was scared and stressed. Kimberly told Officer Kidwell about her smoking complaint, the escalating argument, appellant taking the phone away, and his brandishing the knife and threatening her. Officer Kidwell saw a scratch on Kimberly's arm, and she complained of soreness. In consultation with Kimberly, Officer Kidwell filled out some forms that set up an assault case, indicating that the victim wished to press charges and that the assault was a felony charge.

The next day, Kimberly and A.W. took a U-Haul back to Kimberly's Waco apartment, stopping by Kristen's house on the way. Kimberly appeared to be "achey" and complained about being sore, and Kristen felt some knots on Kimberly's head. Kimberly told Kristen that, after being threatened in front of A.W., she was "completely done" with appellant and was going to file for divorce and pursue criminal charges against him. In fact, it was Kristen's understanding that "criminal charges had actually started."[6]

---

[6] At some point between this time and Kimberly's death, appellant cut off the service to Kimberly's cell phone, which had been activated on a phone plan shared with him.

On September 23, 2012, appellant approached Adrian Miller about going to Waco to get some drugs. Seventeen-year-old Kerrie Mouton, a relative of appellant's, told Miller that he wanted to come along because he felt that something was wrong and that appellant was trying something. The three of them traveled in appellant's white Suburban and got to Waco around noon. Appellant rented a room at the C & E Motel.

While at the motel, appellant, Miller, and Kerrie met a woman with an autistic son. Appellant offered her money to give him a ride somewhere. He told Kerrie that he was going to "check the scene out." Leaving Miller and Kerrie at the motel, appellant and the woman drove off.[7] Appellant later returned to the motel and drove his own vehicle to Kimberly's apartment complex. Cornelius Jefferson was washing clothes when he saw appellant hunched over in front of Kimberly's apartment door.[8] At appellant's request, Jefferson knocked on the door. A.W. looked out the window, but she saw Jefferson, not appellant. When Kimberly answered the door, appellant forced his way into the apartment.

Appellant then pulled a gun out of his pocket and started waving it around. He told Kimberly to get dressed and come with him. Kimberly asked, "Where are we going?" Appellant responded, "Shut up." Kimberly then asked again, "No. Where are we going?" Appellant then responded, "We're going to Port Arthur, and you're going to tell the cops what happened." After Kimberly got dressed, the three of them got into Kimberly's truck, and, at appellant's instruction, Kimberly drove

---

[7] At the punishment stage of trial, Meshia Hicks testified that she was the woman who gave appellant the ride, and she explained where they went and what they did. We detail her testimony later in connection with appellant's sufficiency challenges to the jury's answer to the mental retardation special issue.

[8] Jefferson did not know appellant but identified him later in court.

to the C & E Motel. During the drive, Kimberly once accidentally made a wrong turn and appellant said, "Get your ass over there and turn this way."

When they got to the motel, appellant told Kimberly to honk her horn, and Miller and Kerrie got into the truck. At appellant's direction, they stopped at a store. A.W. needed to use the restroom, so Kimberly told appellant this and opened her door. Appellant cussed at her and directed that they go instead to the apartment complex where Kimberly and appellant used to live. When they arrived at the apartment complex, Kimberly, A.W., and appellant got out of the truck and met their friend Jeanetta. When Jeanetta said "hi" to appellant, he told her to shut up. They stayed only a short time and then returned to Kimberly's current apartment. All of the occupants of the truck—appellant, Kimberly, A.W., Miller, and Kerrie—went into Kimberly's apartment.

Kimberly was nervous. At one point, appellant grabbed her head and forced her to kiss him. Miller was hungry, so Kimberly told him to heat up a pizza. Then she said, "After you eat, I want you all to leave." After that, Kimberly remarked several times that she wanted appellant to leave, and Miller also began telling appellant, "Let's go." At some point, Kimberly told appellant, "Fuck you, Carnell. If you're going to kill me, kill me." When A.W. later told Kimberly that she needed to use the restroom, Kimberly asked appellant, and appellant said, "Yeah, Bitch, go." Kimberly then grabbed her shoes, grabbed A.W.'s wrist, and acted as if both of them were heading up the stairs to the bathroom on the second floor. Instead, Kimberly opened the front door, which was next to stairs. Upon seeing this, appellant ran to the front door, slammed it shut, and pushed Kimberly up against a wall. Appellant then told her to stand on the stairs and said, "It's time to dust away." Appellant then shot Kimberly three times.

Kerrie grabbed A.W. and took her out the back door. He told her it would be ok, but they

soon reentered the apartment and saw appellant grabbing everyone's cell phones.[9] Appellant, Miller, Kerrie, and A.W. got into appellant's Suburban, with Miller as the driver, appellant in the front passenger seat, and Kerrie and A.W. in the back. A.W. and Kerrie were both scared. They stopped at a gas station, and appellant took out three twenty-dollar bills and rubbed them all over his hands. Smirking, he handed the money to Miller and told him to go pay for the gas.[10] Later, they stopped again, and appellant wrapped up his gun and threw it over a fence into a wooded area.

That day, Kristen received a call from A.W., who said she was at the corner store near Kristen's house and needed to be picked up. On the way to the corner store, Kristen received a call from the manager of her apartment complex. The manager informed Kristen that she needed to come to Waco because her mother had been shot and was dead. As it turned out, A.W. was not at the corner store; she was in appellant's Suburban in the city of Bryan.

Crystal O'Rear, a Bryan police officer working patrol that day, responded to a dispatch to look for an older model Suburban, with a particular license plate number, that was involved in a possible kidnapping. Officer O'Rear located and pulled over the vehicle, which was driven by Miller and also occupied by appellant, A.W., and Kerrie.[11] When the officer asked A.W. who hurt her mother, A.W. answered without hesitation. Officer O'Rear also talked to appellant, with whom she

---

[9] This was A.W.'s testimony. Kerrie testified that he grabbed the keys to the Suburban and took A.W. to the vehicle in an attempt to get away, but that they were not able to move fast enough, and "everybody was coming outside and everybody just got into the car."

[10] As we address later, appellant testified that Miller was the shooter. Appellant's act of rubbing the money with his hands and giving it to Miller could be construed as an attempt to transfer gunshot residue to Miller's hands.

[11] Miller and Kerrie both testified that Miller, upon seeing the police car, swerved across the lanes intentionally to provoke a stop.

had no difficulty communicating and who did not appear to have any sort of intellectual disability. Miller and Kerrie also told police officers that appellant had shot and killed someone.

A.W., Miller, and Kerrie all testified at appellant's trial, and while their testimony sometimes varied on details, they told the same basic story of what happened. All three saw appellant thwart Kimberly and A.W.'s attempt to escape, and all three saw appellant shoot and kill Kimberly.

In addition, while in the McLennan County Jail, appellant bumped into inmate Charles Gatlin. Gatlin said, "Excuse me," and appellant responded, "I killed my wife. I'll kill you."

In speaking with Michael Tovar, a cellmate, appellant referred to Kimberly as "that bitch." Regarding the events of September 23, Appellant said that he had gone to Waco because he suspected his wife was cheating on him and that, if he found anyone in her apartment, he was going to kill them. Appellant further stated that, after entering Kimberly's apartment, he went outside to smoke, and, upon coming back inside, he already had the gun in his hand. Then, he "just shot, boom-boom-boom"—killing Kimberly. At one point, Tovar asked why appellant was telling him about the killing, and appellant responded that it did not matter, because "they" (the State) would not be able to try him because of his mental state.

### C. Analysis

Appellant concedes that his first entry into Kimberly's apartment on September 23 was a burglary. He also concedes that he kidnapped Kimberly and A.W. when he transported them from their home to a motel. But he contends that these crimes were "so removed in time as to not have a nexus to the later shooting of Kimberly sufficient to support the conviction for capital murder." Appellant also contends that the evidence does not show that he harmed or threatened to harm Kimberly in retaliation for her reporting his previous assault of her or to prevent or delay her service

as a witness or person who had reported a crime. Because the evidence need only be sufficient to support one legal theory of capital murder to be sufficient to support the conviction,[12] we choose to address only appellant's claim regarding the underlying offense of kidnapping.

A person commits a kidnapping "if he intentionally or knowingly abducts another person."[13] "Abduct" means "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force."[14] "Restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person."[15] "Restraint is 'without consent' if it is accomplished by . . . force, intimidation, or deception."[16]

As appellant concedes, he kidnapped Kimberly and A.W. when he waved his gun and commanded them to go with him in Kimberly's truck to the motel. He used the threat of deadly force (from his gun) to intimidate them to move with him to a place they did not wish to go.[17] But the kidnapping did not end there. He continued to use the threat of deadly force to direct them back

---

[12] *Gardner v. State*, 306 S.W.3d 274, 286-87 (Tex. Crim. App. 2009).

[13] TEX. PENAL CODE § 20.03(a).

[14] *Id.* § 20.01(2).

[15] *Id.* § 20.01(1).

[16] *Id.* § 20.01(1)(A).

[17] *See Swearingen v. State*, 101 S.W.3d 89, 96 (Tex. Crim. App. 2003) (holding that "through the use of the force or intimidation created by having hit her, he restrained her and substantially interfered with her liberty by confining her in his truck while moving her to the forest without her consent and that he did so with the intent to prevent her liberation by either secreting her in a place where she was not likely to be found or by using or threatening to use deadly force").

to Kimberly's apartment and to confine them there.[18] Indeed, immediately before he shot Kimberly, he thwarted an escape attempt.[19] The evidence clearly and overwhelming shows that appellant murdered Kimberly while he was kidnapping both Kimberly and A.W. Point of error six is overruled.

## II. SUFFICIENCY OF THE EVIDENCE – MENTAL RETARDATION

In point of error eleven, appellant contends that he is ineligible for the death penalty due to "intellectual disability." In point of error ten, he contends that the jury's answer to the "intellectual disability" special issue was against the great weight and preponderance of the evidence. Both of these challenges are directed at what was labeled the "mental retardation" special issue at the punishment stage of trial. That special issue asked, "Do you find, taking into consideration all of the evidence, that the Defendant is a person with mental retardation?" A "no" answer to that issue was required in order to assess the death penalty, and the jury answered that issue "no."

### A. Standard of Review

In *Atkins v. Virginia*, the Supreme Court held that the execution of mentally retarded individuals violates the Eighth Amendment to the United States Constitution.[20] The Constitution is violated by the execution of a person of low intelligence when the person is "so impaired as to fall

---

[18] *See Hines v. State*, 75 S.W.3d 444, 448 (Tex. Crim. App. 2002) (victim continued to be under abduction while defendant threatened her physically "by pointing a gun at her and leading her around by the neck"); *Fitzgerald v. State*, 782 S.W.2d 876, 881 (Tex. Crim. App. 1990) (referring to offense of kidnapping as "a continuous, ongoing event").

[19] *See Reyes v. State*, 84 S.W.3d 633, 637 (Tex. Crim. App. 2002) (evidence sufficient to show capital murder with underlying evidence of kidnapping when victim was alive while restrained and assaulted two times before she was ultimately killed).

[20] *Atkins v. Virginia*, 536 U.S. 304 (2002); *Ex parte Moore*, 470 S.W.3d 481, 486 (Tex. Crim. App. 2015). *See* U.S. CONST. Amend. VIII ("nor cruel and unusual punishments inflicted").

within the range of mentally retarded offenders about whom there is a national consensus."[21] The Supreme Court left to the States the task of tailoring appropriate ways to enforce this restriction.[22] In *Ex parte Briseno*, we established interim guidelines for implementing *Atkins* in Texas until such time as the Texas Legislature chooses to do so.[23] Because the Legislature has not acted, we continue to follow the *Briseno* guidelines.[24]

A demonstration of mental retardation that would exempt an offender from execution requires showing the following by a preponderance of the evidence: (1) significantly subaverage general intellectual functioning, generally shown by an intelligence quotient (IQ) of 70 or less; (2) accompanied by related and significant limitations in adaptive functioning; and (3) the onset of the above two characteristics having occurred before the age of eighteen.[25] In evaluating the first prong, we take into consideration the standard margin of error for IQ tests, which is generally five points.[26] In determining whether related and significant limitations in adaptive functioning exist, courts can look to standardized test scores but should also look to the following factors:

> • Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> • Has the person formulated plans and carried them through or is his conduct

---

[21] *Atkins*, 536 U.S. at 317.

[22] *Id.*; *Moore*, 470 S.W.3d at 486.

[23] 135 S.W.3d 1, 4-5 (Tex. Crim. App. 2004).

[24] *Moore*, 470 S.W.3d at 486.

[25] *Id.*; *Briseno*, 135 S.W.3d at 7 & nn. 24-27.

[26] *Moore*, 470 S.W.3d at 487.

impulsive?

• Does his conduct show leadership or does it show that he is led around by others?

• Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

• Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

• Can the person hide facts or lie effectively in his own or others' interests?

• Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?[27]

Appellant contends that we should abandon these factors in light of what he believes are the clinical standards and the effect of the Supreme Court's decision in *Hall v. Florida*.[28] Appellant acknowledges that we have refused to abandon the *Briseno* factors after *Hall*.[29] We decline appellant's invitation to do so today.[30]

Appellant's eleventh point of error alleges generally that appellant is ineligible for the death penalty due to intellectual disability. To the extent this claim can be construed as a request to conduct an independent review of the record similar to our review as the ultimate factfinder in a

---

[27] *Moore*, 470 S.W.3d at 489; *Briseno*, 135 S.W.3d at 8-9.

[28] 134 S. Ct. 1986 (2014).

[29] *See Moore*, 470 S.W.3d at 486-87 ("It may be true that the AAIDD's and APA's positions regarding the diagnosis of intellectual disability have changed since *Atkins* and *Briseno* were decided. Indeed, we have recently discussed the subjectivity surrounding the medical diagnosis of intellectual disability and some of the causes for that subjectivity. But although the mental-health fields and opinions of mental-health experts inform the factual decision, they do not determine whether an individual is exempt from execution under *Atkins*.").

[30] As we shall see below, however, the evidence would nevertheless be legally and factually sufficient even without considering the *Briseno* factors regarding adaptive functioning.

habeas setting under Article 11.071,[31] we decline to do so. The issue of mental retardation was litigated at trial before a jury, and on direct appeal from that trial, we exercise appellate-style deference to the determination made by the factfinder.[32] To the extent that appellant's eleventh point of error can be construed as advancing a legal sufficiency challenge, we will address that complaint, along with the factual sufficiency challenge advanced in point of error ten.

Mental retardation is a punishment-mitigation issue that is in the nature of an affirmative defense, and the defendant shoulders the burden of proof to show mental retardation by a preponderance of the evidence.[33] In conducting a legal-sufficiency review of a jury's finding against an issue on which the defendant has the burden of proof, "[w]e first search the record for evidence favorable to the finding, disregarding all contrary evidence unless a reasonable factfinder could not. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law."[34] In conducting a factual-sufficiency review,[35] an appellate court

---

[31] *See Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (In article 11.071 proceedings, "this Court is the ultimate factfinder" and "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions."); TEX. CODE CRIM. PROC. art. 11.071.

[32] *See Ex parte Garcia*, 353 S.W.3d 785, 787-88 (Tex. Crim. App. 2011) (finding a significant distinction between habeas proceedings in which this Court is the ultimate finder of fact and habeas proceedings in which the trial court is the sole finder of fact; concluding that there is "less leeway" in the latter context to disregard findings of a trial court).

[33] *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008).

[34] *Matlock v. State*, 392 S.W.3d 662, 669 (Tex. Crim. App. 2013).

[35] Although *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), abolished factual-sufficiency review for elements of the offense that the State is required to prove beyond a reasonable doubt, a factual-sufficiency review is still available for affirmative defenses or affirmative mitigating issues upon which the defendant bears the burden of proof. *Butcher v. State*, 454 S.W.3d 13, 20

views the evidence in a neutral light and determines whether the jury's finding is "so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased."[36] Even in a factual-sufficiency review, an appellate court may not substitute its judgment for the factfinder's assessment of the weight and credibility of the testimony of witnesses, and an appellate court may find evidence to be factually insufficient only after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict and why the verdict is manifestly unjust, conscience-shocking, or clearly biased.[37]

## B. The Evidence

In addition to the evidence recited in connection with appellant's sixth point of error, the following evidence is relevant to appellant's mental-retardation claims:

### 1. *Appellant's Guilt Stage Testimony*

Appellant testified at the guilt stage of trial. His testimony appeared to be coherent and fluid. He testified about becoming a pen pal with Kimberly. He stated that they wrote three or four letters a week to each other. Appellant stated that he had different people helping him with the letters. They would help him with spelling and, after he wrote what he wanted to say, they would "put it into sentences and stuff" for him. Kimberly began to visit him in prison for two hours nearly every week.

Appellant gave exculpatory accounts of the incidents that occurred on September 13 and 23, 2012. Appellant claimed that, after he drove Kimberly home from the rap studio on September 13, they got into an argument about whether he was going to return to the studio. Appellant claimed that

_____

(Tex. Crim. App. 2015).

[36] *Matlock*, 392 S.W.3d at 671.

[37] *Id.*

Kimberly started slapping him, and when he told her that he was returning to the studio, she grabbed a knife and swung it at him. Appellant said that the knife cut his shirt and caused him to bleed a little. Appellant further testified that A.W. said she was going to tell the police what Kimberly did to appellant but that Kimberly started spanking her.

Appellant testified that he went to Waco on September 23 to retrieve a laptop, some clothes, and a $300 deposit from a landlord. He said that Miller and Kerrie were with him because he did not know how to get to Waco and had trouble reading a map. Appellant claimed that Kimberly voluntarily opened the door for him and that he entered the apartment without incident. Appellant said that he told Kimberly he could not stay for long because he came with some other people. Appellant further testified that Kimberly said, "Let's go get them," and he and Kimberly drove to the C & E Motel. Appellant said that Kimberly drove her truck because, "She don't like driving that big, old Suburban. She don't like driving it. It's too big."

Appellant testified that Miller had a gun with him. He stated that Miller and Kimberly got into an argument and that Miller shot her. Appellant said he threatened to call 9-1-1 but that Miller pointed his gun at him and said they were going to Houston. According to appellant, when they stopped at a gas station, he went in and told the clerk to call 9-1-1.[38]

Defense counsel also asked appellant about a written business plan, an autobiography (of appellant), and a Facebook page purporting to belong to appellant. Appellant claimed that an inmate named Ellis Randle wrote the business plan, that another inmate named William Dahl wrote the autobiography, and that Kimberly set up the Facebook page.

---

[38] A store clerk had previously testified that appellant walked into the store appearing nervous and that the clerk later called 911. The trial court excluded any questioning regarding the content of any conversation the clerk had with appellant.

On cross-examination, appellant acknowledged that he spent nearly twenty years in prison for attempted murders and aggravated assaults. He also acknowledged that he had told Kimberly that with one phone call he could cause fifty to seventy-five people to show up on his behalf. Appellant admitted that the letters from him to Kimberly were in his handwriting, but he maintained that others wrote things for him that he copied into those letters. Appellant also admitted that he had no trouble driving by himself from the C & E Motel to Kimberly's apartment complex. Appellant denied obtaining a ride from Meshia Hicks to drive around the apartment complex before driving there himself.

### 2. *Meshia Hicks*

At the punishment stage of trial, Meshia Hicks testified that, on the day of Kimberly's murder, she was staying at the C & E Motel. Appellant offered to give her gas money in exchange for a ride. She agreed, and appellant directed her to Kimberly's Waco apartment. While there, appellant directed Hicks to drive around the parking lot a few times, occasionally telling her to slow or stop, and then they returned to the C & E Motel.

### 3. *Appellant's Criminal Record*

Appellant committed a burglary when he was ten years old and a theft when he was eleven. At age twelve, he committed the offenses of criminal mischief and assault causing bodily injury. At age thirteen, he committed another assault causing bodily injury against Romona Sostand. When he was fourteen, he committed another assault causing bodily injury, and he broke the window of a truck owned by a school principal. For the assaults, appellant was adjudicated delinquent as a juvenile and placed on probation. At age fifteen, appellant committed a burglary. About five months later, appellant's probation was revoked for truancy, electronic monitoring violations, and

curfew violations, and he was sent to a juvenile facility.

At age sixteen, appellant committed two attempted murders and three aggravated assaults at different times against different victims. The attempted-murder victims were Fredrick Nico and Victor Loeb. The aggravated-assault victims were, Raffiel Dugas, Elizabeth Beale, and Alfred Smith. Nico, Dugas, and Smith were acquaintances of appellant. Beal was a sixty-four-year-old teacher at a juvenile detention center. Victor Loeb was a seventy-nine-year-old man who had no prior relationship with appellant.

The offense against Nico involved appellant's use of a gun that was sitting on a table. Appellant had told authorities that Nico picked up the gun and pointed it at appellant and his brother, that appellant wrestled the gun away, and that the gun fired several times during the struggle. But according to Nico, appellant took the gun off the table without provocation, ran to the back of the yard, and shot Nico. Other witnesses backed Nico's version of events. Appellant later gave a statement that was consistent with Nico's account.

Loeb was a random victim of a drive-by shooting that was tied to appellant.

The offense against Dugas occurred at a nightclub. Dugas broke up a fight between appellant and a friend of his, which then caused a fight between Dugas and appellant. Dugas won the fight, and appellant ran off, but he returned later and beat Dugas with a chair. Dugas was in a coma for a week. He had a broken jaw and a lost tooth, his lip was split up to his nose, and he underwent surgery and received stitches. At trial twenty years later, Dugas still bore scars from that incident.

The incident with Beal occurred at the Jefferson County Detention Center when Beal attempted to get appellant and several other males to quiet down in class. Appellant went to the front of the room and slapped Beal in the head hard enough to cause her to fall over a desk. Beal suffered

injuries to her head, left eye, and her thigh.

The incident with Smith occurred when appellant asked him where his cousin was.  When Smith said he did not know, appellant threatened him with a firearm.

Appellant was certified to stand trial as an adult for these offenses.  He pled guilty and was sentenced to ten years for the aggravated assaults and twenty years for the attempted murders, to run concurrently.  The judgments for all of these offenses were pronounced on July 6, 1993.

### 4. *Substance Abuse History*

The prosecutor read a penitentiary packet to the jury.  A section of this packet, entitled "Substance Abuse History," explained that appellant started drinking alcohol at age sixteen. Appellant had claimed that he drank "very rarely" and had no problem with alcohol, but a Port Arthur police report indicated that appellant admitted to drinking nine to ten beers a day.  Regarding drug abuse history, the pen packet said that appellant had admitted to using marijuana three times at age fifteen but denied any addiction to drugs.  However, appellant had claimed that he started selling crack cocaine at age fifteen and would make at least $500 a day.  Appellant had claimed that the money was spent to buy more cocaine and for partying.

### 5. *Appellant's Education Records*

Appellant's grades in reading and arithmetic in the first and second grades were below average.  His grades were average for other language arts, social studies, and science.  Notations for those two grades showed that appellant put forth average effort but was below average in citizenship.

Appellant was "retained" in the third, sixth, and ninth grades, which meant that he was supposed to repeat those grades.  Records admitted at trial did not show whether he actually went to school when he was supposed to repeat the sixth grade.  The records also indicated that appellant

began ninth grade the year after he would have repeated sixth grade, effectively skipping seventh and eighth grades.

In appellant's initial third grade year, his grades (excluding physical education) were: 54, 45, 40, 71, 37, 78, 80, 79, 79, and 74. Appellant had twenty-nine absences from school. In his subsequent third grade year, his corresponding grades were 63, 43, 53, S, 63, 60, 51, N, S, and N, and he had seven absences.[39] In fourth grade, appellant made grades of 72, 64, 62, S, 74, 70, 72, S, S+, and N, and he had 30 absences. In fifth grade, his grades were 75, 76, 76, S, 75, 75, 75, S, S, and N.[40] On both the third and fifth grade versions of the TEAMS test, appellant passed the reading section but did not pass the math and writing sections.

Appellant was below his grade equivalent on all of his scores on the California Achievement Tests (CAT) taken in third through fifth grades. His CAT scores generally increased from his initial third grade year to his subsequent third grade year and from his fourth grade year to his fifth grade year, though there were a couple of exceptions where the score declined. Comparing the subsequent third grade year with the fourth grade year yields a mixed result, with about an equal number of scores increasing versus declining. His scores for the initial third grade year (3.6)[41] ranged from a grade level of 1.7 to 2.8, while his scores for the subsequent third grade year (also 3.6) ranged from 2.4 to 2.9. His scores from his fourth grade year (4.6) ranged generally from 2.0 to 3.6 with one score of 0.8, while his scores from his fifth grade year (5.6) ranged generally from 2.0 to 3.8 with

---

[39] Although the record does not make this clear, the designations "S" and "N" appear to mean, respectively, "satisfactory" and "needs improvement."

[40] Appellant's physical-education grades from his initial third grade year through fifth grade were 85, N, N, and S.

[41] 3.6 appears to denote a point in time more than halfway through his third grade year.

one score of 5.2.

In his initial sixth grade year, at middle school, appellant's grades were in the 50s or low 60s. His CAT scores were, with one exception, uniformly lower than they were in fifth grade. These scores ranged from 1.7 to 4.1. In appellant's initial ninth grade year, most of his grades were 50, with a 55 and a 60. In his subsequent ninth grade year, some of his grades in his first grading period were higher, with grades of 61, 62, 72, 57, 61, 53, and 72. In the second grading period, most of his grades were 50, with a 56 and a 55.

### 6. *Family Members' Punishment Stage Testimony*

#### a. *Appellant's Mother*

Ophelia Ortiz, appellant's mother, described appellant as "slow," and she stated that she had to give him more attention than her other children when he was growing up. Ophelia further described appellant's behavior, as a child and as an adult, as follows: As a baby, appellant cried all the time. At age two months, he kicked a glass bottle and broke it. Appellant was a bedwetter, and Ophelia did not "know if he has stopped yet. All his life he been peeing on himself." When he was a child, appellant could not tie his shoes, dress himself, take a bath, or brush his teeth.[42]

Even though the family lived "right by the school," appellant would forget where to go and "would go another direction." Appellant had to be walked to school because he would not go on his own. Not only would appellant skip school, sometimes he would be missing from home for as much as three days at a time.

Ophelia was called about appellant's school behavior all the time. Appellant would be absent

---

[42] But Ophelia also testified that appellant had to be told when to take a bath, and she also stated that appellant told her, "Mom, I can bath myself."

at school, and when he was at school, he could not do the work, so he was placed in Special Education. Even in Special Education, however, he could not pass. Appellant had difficulty reading and writing. He would not do his homework and would not follow instructions, even if given a list. He had to repeat some grades in school. Appellant could not pass the driving test.

When appellant was a child, he did not play with toys, watch television, or play video games. He would "just sit there" or walk out and leave, and family members would not know where he went.

Even as an adult, appellant had temper tantrums as if he were two years old. Appellant would stomp, jump, cry, shake his head, and vomit. When appellant left prison, he could not keep his apartment clean, so his sister would come over and clean it. Appellant did not wash dishes, did not put food away, and left clothes strewn across the floor. He could not use a washing machine or a dryer. He did not watch television or use a DVD player, and he could not operate a cell phone. Appellant also could not be trusted with money because he could not make change.

The State cross-examined Ophelia about appellant's writing ability:

Q. So it would surprise you if he was a prolific writer, wouldn't it?

A. Yeah, it would.

Q. Would it surprise you to know that he's a self-admitted writer of over 800 musical songs?

A. (Laughing) That's funny. No, he's not.

Q. He's not?

A. No.

Q. Do you think it would be difficult for Carnell to even compose a simple letter to another person?

A. It would. Somebody would have to help him.

The prosecutor then showed Ophelia forty letters that appellant admitted to writing that were in his handwriting. Ophelia replied that, if he wrote them, he must have improved while he was in prison.

The prosecutor further questioned Ophelia about appellant's capabilities, saying, "[T]he way you've described your son, the person you described was essentially a piece of meat that sat there. He would pee on himself. Right?" Ophelia responded, "Well, that's when he was younger, before he went to prison. . . . I don't know if he still pee on himself." However Ophelia then corrected herself, saying that appellant "probably did still pee on himself."[43] Later, she answered affirmatively when the prosecutor asked her if she would be surprised to know that no one else who knew appellant during his youth has said he peed on himself during the day. And she answered affirmatively that she would be surprised that appellant made it through eight weeks of the current trial without once having a peeing accident.

After the prosecutor suggested that Ophelia would do anything, including lie, for her son, Ophelia responded, "I don't lie," but then said, "I know the police reports in Port Arthur said I had a false report." The prosecutor then questioned her about the incident in which appellant shot Nico. Ophelia had told the police that Nico retrieved the gun from a rag on the table and that appellant began wrestling Nico for it. At appellant's current trial, Ophelia maintained that her story was correct despite other evidence—from Nico, appellant, and other witnesses—that appellant had snatched the gun off the table, walked some distance away, and then returned and shot Nico. The prosecutor also questioned Ophelia about her helping appellant make a $100,000 bond in that case.[44]

---

[43] Ophelia further testified, "I didn't say he didn't pee on himself. . . . He always did pee on himself. . . . From a baby until he got out of prison." (Prosecutor's questions and interjections omitted.).

[44] Ophelia stated that she did not remember the exact amount.

The prosecutor also questioned Ophelia about the fact that appellant was required to have a job as a condition of parole. Ophelia responded that appellant worked with his uncle cutting yards. The prosecutor asked Ophelia about the fact that appellant regularly had hundreds of dollars in small bills in his possession. Ophelia responded that she gave him the money from garage sales.

Even though she contended that appellant did not know how to drive, Ophelia acknowledged that she had bought him a white Suburban. She said that Kimberly wanted it, but admitted that Kimberly already had a truck. However, Ophelia maintained that Kimberly loved driving the Suburban. When the prosecutor questioned her about her testimony that appellant could not tie his shoes, Ophelia responded, "I don't know about today. Like I say, maybe he done learned."

The prosecutor also asked Ophelia if appellant played sports as a child. When she responded that he did not, the prosecutor asked about baseball. Ophelia acknowledged that appellant had tried baseball but did not have the patience for it. She denied the prosecutor's allegation that appellant was, for a time, the starting pitcher on a baseball team. She also denied that appellant had any interest in bowling or boxing. In letters written to Kimberly, however, appellant had said that he was the starting pitcher of his baseball team at school and that he enjoyed boxing and bowling.

The prosecutor also asked Ophelia if appellant had a record company. Ophelia responded that her other son had such a company. The prosecutor then asked, "And you know that Carnell has written dozens, in fact, hundreds of rap songs, don't you?" Ophelia responded, "Anybody can write rap songs," but later said she was not aware that appellant had written any.

b. *Appellant's Sister*

Appellant's sister, Sabrina Mouton, testified that appellant cried all the time when he was a baby, that he did not start walking until he was two years old, and that he did not start talking in

a way that others understood until age four or five. She said he wet himself even when he was older. She also said that appellant never played sports and "always just wandered around" the neighborhood. Appellant had no special interests, did not play games, and did not even watch television. Sabrina also stated that appellant could not ride a bicycle and that he never knew how to count money.

When appellant was released from prison, he was unfamiliar with eating at a buffet-style restaurant and he did not know how to use a cell phone. Sabrina said that she tried to teach appellant how to use a cell phone, but he could not figure it out. When asked, "Did he ever figure it out?" Sabrina responded, "I never knew, but he probably did." Sabrina further testified that she helped set up and furnish an apartment for appellant because he did not know what he needed. She said that appellant could not use a microwave, that she was not successful in teaching him how to use it, and that "he would put the wrong things in it." Sabrina said she would go over to the apartment twice a day to make sure appellant had enough to eat and to clean up because appellant would not clean up after himself, would leave clothes on the floor, would leave food out, and would leave candles lit for no reason.

Sabrina testified that appellant would write to her from prison, but his letters were difficult to understand unless he had someone write for him. When asked why she would think someone wrote a letter for him, she said that appellant's writing "looked like something a preschooler or kindergartner" would write, but if someone wrote the letter for him, then the letter would be in good handwriting. Sabrina also stated that appellant had unrealistic expectations about what he could do, saying that he wanted to be rich, to do music, or to have a business.

On cross-examination, Sabrina admitted that the constant crying as a baby was diagnosed

by a doctor as a stomach problem. After being cross-examined about appellant having an interest in boxing, Sabrina agreed that appellant showed some interest in extracurricular activities as he got older but not as a child. When asked if appellant started developing more adult feelings and enjoying sporting activities, Sabrina responded, "I'm sure he did, but I wasn't there for that. I didn't see that."

On the subject of appellant's ability to write, the prosecutor asked if his writing had improved while in prison. Sabrina admitted that it had improved "a little bit." The prosecutor subsequently told Sabrina, "I'm going to show you what I've admitted into evidence as State's Exhibit 126, and I'm going to do the Carnell Petetan letter grab bag. Go ahead and pick a letter, any letter." Sabrina drew out of the bag a letter postmarked January 24, 2011. The letter read, in part,

> I Hope and Pray when this letter reaches you it finds you in the best of health as well as spirits in God's Care and Protection as well as your love ones. Kim I want you to know I was Glad to hear about your School progress and them welcoming you to Join they organization.[45]

Sabrina acknowledged that the letter was in appellant's handwriting. She further stated that "those letters look clearer than my letters, and Carnell writes up and down, up and down, and out of the margin and not clear at all." When confronted with the fact that the letter to Kimberly that the prosecutor had Sabrina read did not conform to her "up and down" description, Sabrina stated, "His

---

[45] This text is taken from the actual letter contained in State's Exhibit 126. The reporter's record containing the prosecutor's reading of the letter fails to capture variances in capitalization, and there are a few instances in which the prosecutor simply misread the letter. The reporter's record rendition of the letter is as follows:

> I hope and pray when this letter reaches you it finds you in the best of health as well or spirits in God's care and protection as well as your loved ones. Kim, I want you to know I was glad to hear about your school progress and them welcoming you to join the orientation.

(Prosecutor's repetition of part of the letter and interruptions omitted).

looks neater on hers than it does on ours."

Sabrina also acknowledged that appellant had been in prison since the early 1990s and had never lived on his own before he was released from prison. And she admitted that appellant had tried to better himself in prison and that he was able to formulate business plans for when he got out of prison from books he obtained from the prison library.

When asked on redirect whether appellant was "able to eventually figure things out," Sabrina responded, "Just slowly. Never right off the bat, can't just grasp it just as quick as we do." Whenever he has to learn something new, appellant "gets frustrated or just like he loses interest in it or he just – like his mind just go blank, like he looking off like he don't care to hear it."

### c. *The Gauthiers - Aunt and Cousins*

Appellant came to live with the Gauthier family when he was thirteen or fourteen years old. Cathy Gauthier was appellant's aunt,[46] and she had two children, Caston and Kimberly ("Kimberly Jackson").[47] Cathy testified that appellant was a little bit slower than her own kids, but she never had to discipline him. Appellant was just a little different, "real quiet all the time." Cathy was a bail bondsman, and appellant wanted to be a bail bondsman or a rap singer. Cathy explained to him that he could not be a bail bondsman because of prior felony convictions, but appellant did not seem to understand that. Appellant had "big dreams."

On cross-examination, Cathy testified that, when appellant was staying with her, he once expressed concern that he might have gotten a girl pregnant. She also testified that appellant mailed

---

[46] His father's sister.

[47] We refer to Kimberly Jackson by her current first and last name to avoid confusion with the victim, who was also named Kimberly.

her an article about bail bondsmen while he was in prison.

Caston testified that he was eight or nine years old when appellant came to stay with them. Appellant had talked about being a bail bondsman, but Caston thought that was not realistic because "that's too way advanced for him." On direct examination, Caston described appellant as "slow," but on cross-examination, Caston stated that he did not remember thinking of appellant as a retarded person. Caston acknowledged that appellant understood that one of the possible consequences of having sex with a woman was that she might end up giving birth to a child. Caston also testified that appellant played hide-and-seek with him and that they played games and had fun together.

Kimberly Jackson was fourteen years old when appellant came to live with them. She described appellant as "a little different" and "not on the same level, mind-wise," being "slower." Appellant was her age, but she said that he could not do the same things she could do. She could not remember any examples. When asked if she remembered anything specific about appellant staying clean and his hygiene, Kimberly Jackson replied, "[Y]ou had to stay on him about it."

### d. *Appellant's Uncle*

Thomas Kemper, appellant's uncle,[48] testified that appellant was "really slow" and "had problems making decisions on his own." According to Kemper, younger children would manipulate appellant. Kemper also said that appellant would crawl up under a train even though other children would beg him not to. Kemper testified that appellant was in Special Education classes because "he couldn't comprehend like any other kid." When he was twelve years old, appellant had to be told not to open the door when someone knocked without first asking who it is. Appellant let his hair grow long, he would not comb it, he would not take a bath, and he would not put on a belt.

---

[48] His mother's brother.

When appellant was released from prison, he wanted to be a businessman, but Kemper testified that appellant "couldn't understand how to go from A to Point Z." Kemper said that appellant had "great big dreams" but simple things about business, such as getting a DBA[49] or Assumed Name Certificate, had to be explained to him, "and even if you explained it to him, he still did not understand."

On cross-examination, the prosecutor asked Thomas if he was aware that appellant had obtained a DBA. Kemper responded, "No, I'm not." When the prosecutor replied, "So if he did that, apparently he was able to take your advice and . . . he did get the DBA," Kemper responded, "Through Kim." The prosecutor replied, "Well, you don't know that, do you, sir," and Kemper responded, "Yes, sir, I do" because Kimberly "called me." Then the following colloquy occurred:

> Q. No. Thank you, sir. Just a moment ago, Mr. Kemper, when I asked you if you were aware that your nephew had gotten a DBA, you said, no, you weren't aware of that, and yet the very next questions that I asked you, you started to say that you knew that Kim got a DBA for him.
>
> A. No.
>
> Q. Now, let me just ask you: Did you know or did you not know before I asked you the question?
>
> A. No, I didn't. I didn't know, sir.
>
> Q. And that's all that I need to know, sir.
>
> A. I didn't know.

### 7. *Appellant's Prison Pastor*

Edmond Bolton Stewart was a pastor involved in jail ministry. He testified that appellant was difficult to talk to, because his mind would "just wander off to something else"—with appellant

---

[49] Doing Business As.

suddenly switching to a subject having nothing to do with what the conversation had been focusing on. Stewart testified that this happened with appellant on a regular basis. Stewart conceded that he first came in contact with appellant just three to four weeks before his testimony at trial, and he admitted that he opposed the death penalty.

### 8. *Psychological Testimony and IQ Tests*

#### a. *IQ Test in February 1991*

Texas Juvenile Justice Commission records show that, in February of 1991, at age fifteen, appellant was administered a child IQ test. The test yielded a verbal IQ score of 67, a performance IQ score of 61, and a full-scale IQ score of 61.

#### b. *Dr. Scott - Evaluation in November 1991*

Before arriving at a juvenile justice facility, appellant had been taking the antipsychotic medication Mellaril. In November 1991, Dr. Harold Scott, a psychiatrist, examined appellant to determine whether he should resume taking that medication. Dr. Scott determined that appellant did not need to do so. As a result of the examination, Dr. Scott also diagnosed appellant as having conduct disorder[50] and, based in part on previous test scores, "mild mental retardation versus borderline intellectual functioning." Dr. Scott testified that mild mental retardation generally referred to a full-scale IQ score of 55 to 69 while borderline intellectual functioning referred to a full-scale IQ score of 70 to 74. The phrase "versus borderline intellectual functioning" was a hedge on the intellectual diagnosis because appellant's passive-aggressive nature and his stubbornness undermined the usefulness of the clinical interview as a measure of intellectual ability. "In other

---

[50] His notes also stated that appellant was diagnosed as having oppositional-defiant disorder, but Dr. Scott testified that that diagnosis was redundant because someone with conduct disorder would necessarily have oppositional-defiant disorder.

words," Dr. Scott stated, "I don't know that he is as low as he appeared. Stubbornness can contaminate that and someone can look worse than they really are." Dr. Scott also affirmed that someone who chooses not to gain an education can also appear lower than he really is. And he agreed that it was possible to fake poor results on an IQ test.

The prosecutor posed hypothetical questions about whether an IQ score of 74, or a score falling within the range of 71 to 77, would indicate mild mental retardation. Dr. Scott said that would indicate borderline intellectual functioning instead of mental retardation.

### c. *Dr. Coxe - IQ tests in April 1992*

Dr. Ray Coxe, a psychologist, administered intelligence and achievement tests to appellant at age sixteen in April 1992. This testing was conducted pursuant to direction from the Jefferson County Juvenile Probation Office. Because the intelligence tests for both children and adults were qualified for sixteen-year-olds, and because appellant's attitude suggested that he was not putting forth his best efforts, appellant was required to take both tests.[51] Dr. Coxe testified that, on some items and some tests, appellant "gave up very quickly without making too much of an effort" and had "a little bit of an attitude about the testing." Appellant's full-scale IQ score on the child test was 64 and on the adult test was 74. Dr. Coxe testified that, when a child is administered both tests, it is not uncommon for the adult test score to be as high as ten points higher than the child test score.[52]

Dr. Coxe also testified that, when questioned by him, appellant appeared to understand the

---

[51] The tests were the Wechsler Intelligence Scale for Children (WISC) and the Wechsler Adult Intelligence Scale (WAIS).

[52] Dr. Joan Mayfield, whose testimony we discuss in detail later, referred to this potential differential as an "error that is associated with that scoring of that age range."

role of his attorney.[53] Appellant also understood that the prosecutor was an adversary of his,[54] and he indicated an understanding of the consequences of being found "guilty" or "not guilty" of the serious offenses of which he had been accused. Dr. Coxe also testified that he found no evidence that appellant suffered any delusions or psychosis.

Dr. Coxe acknowledged that there were many reasons aside from mental retardation for an individual to score below a 70 on an IQ test. These reasons include brain damage from a head injury, mental illness, a physical health problem, undiagnosed visual impairment, and a severe communication disorder. Although appellant did not appear to suffer from any of these conditions, Dr. Coxe also acknowledged that "an individual, if they are so motivated, can make themselves appear less intelligent than they really are." The honesty of the subject during testing was an important part of determining the reliability of the test, and Dr. Coxe's belief that appellant's performance on the first test reflected "some question about motivation" and was the result of "less than full effort" spurred him to administer a second test. When asked if someone could fake a score of 70 on an IQ test, Dr Coxe responded affirmatively as follows:

> I think any test can be faked, no question about it, and that's what you consider when [you're] administering it. You don't accept the fact that all scores are accurate, so you're paying attention to that, you're looking for that, and if certain behaviors, if they occur, you kind of suspect it and do additional work.

When asked if he thought appellant was "an honest individual," Dr. Coxe said, "I don't think so."

Dr. Coxe further testified that the first test—where he had doubts about whether appellant was putting forth his full effort—was the child test, which yielded the lower IQ score. Dr. Coxe felt

---

[53] Appellant stated, "She fights for me and helps me get out of trouble."

[54] Appellant stated, "The District Attorney tries to get you."

that the second test, the adult test that yielded an IQ score of 74, was a reliable indicator of appellant's functioning. That test had a standard error measurement of three points, which could yield an IQ score as high as 77 or as low as 71. Dr. Coxe stated that an IQ of 74 would probably not be used to classify someone as mentally retarded. Rather, he stated, "It's borderline."

But Dr. Coxe also testified that his "overall impression," based on the results of testing and on observations during interviews, was that appellant "was mildly retarded." Dr. Coxe felt that the achievement test scores—a reading score of 70, a spelling score of 61, and an arithmetic score of 46—were consistent with falling within a lower range. Dr. Coxe did not, however, conduct any adaptive behavior testing. And Dr. Coxe acknowledged that someone who did not attend school much—like appellant–would not be expected to score well on achievement tests.

#### d. *Testing by the Adult Prison System*

Travis Turner, the Vice Chairman of Classification in the Texas Department of Criminal Justice (TDCJ), testified that an offender is given an initial IQ test upon entering the prison system. If the offender scores below a certain cutoff, then a "secondary test"—involving adaptive behavior screening—is given to consider whether the offender should be assigned to the "developmentally disabled" program in the Hodge Unit. Appellant's score on the IQ test was 69, so he was given the secondary test. Appellant was not assigned to the Hodge Unit.

#### e. *Dr. Correia's Report - IQ test in 2012*

In 2012, IQ testing was done as part of a Social Security disability assessment. Appellant was administered the WAIS-III[55] IQ test, which yielded a full-scale IQ score of 55. The psychologist who conducted the test, Dr. Mark Correia, did not testify at trial, but his report was admitted into

---

[55] Wechsler Adult Intelligence Scale - Third Edition.

evidence. Dr. Correia diagnosed appellant as having antisocial personality disorder and mild mental retardation. The "mild mental retardation" diagnosis was provisional "due to lack of supportive documentation from the developmental period."

Dr. Correia's report included many comments about appellant's appearance and demeanor. During the testing, appellant was "casually, but appropriately attired," and his speech was "clear and well-formed." Appellant presented an "aloof, self-absorbed manner . . . was largely disinterested in others, but responded to questions in a reasonably direct and appropriate manner." Appellant's "disinterested and aloof demeanor" was maintained through much of the evaluation. Appellant was "quite impatient and demonstrated a tendency to quickly become overloaded cognitively by complexity and respond with significant frustration." His behavior was "impatient and unsophisticated, with limited intellectual functioning adding to his modest repertoire of social skills."

Appellant "had little interest in the exam, requesting repeatedly to be allowed to leave to smoke a cigarette, use the restroom and take cell phone calls." He seemed to "put forth an effort to cooperate minimally and superficially only." Dr. Correia's evaluation suggested that appellant "is able to perform tasks completely and appropriately, within reasonable periods of time, when properly motivated to do so. Motivation is likely to be problematic, however."

Appellant was "able to adequately recall information when properly motivated." But he "had little interest or ability to mentally manipulate information [in] his working memory." Appellant's overall memory was estimated to be commensurate with his mildly deficient level of intellect generally. Appellant's judgment and insight appeared to be distorted. Dr. Correia found that appellant had little insight into how his behavior and attitude affected others and that appellant consistently blamed his problems on others and refused to accept responsibility for them. However,

appellant was "able to understand appropriate behavior."

### f. *Dr. Craig - Defense-Ordered Adaptive Behavior Testing*

Dr. Ellis Craig, a psychologist, conducted an evaluation at the request of the defense to determine whether appellant had adaptive deficits. He used the Adaptive Behavior Assessment System II (ABAS-II), which uses people who know the subject (called "informants") to assess the subject's adaptive behavior in a number of areas. Dr. Craig used the version of the assessment system that was normed for thirty to thirty-nine year olds.[56] In addition, Dr. Craig conducted the assessment retrospectively, because no one had ever before conducted a standardized adaptive behavior scale on appellant, much less during appellant's developmental period (i.e., prior to age eighteen), but he said that there was an earlier non-scored assessment that he thought seemed consistent with the results Dr. Craig obtained.[57] Dr. Craig explained that a retrospective assessment is having respondents describe how the defendant was during the developmental period (prior to age eighteen). Dr. Craig asserted that a retrospective assessment of an incarcerated individual was necessary because a current adaptive behavior assessment in a jail or prison setting was not feasible, due to the lack of opportunity to see how the person performs in everyday life.

In conducting this assessment system, Dr. Craig obtained assessments of appellant's adaptive functioning from appellant, his mother, an older brother, an older sister, and an uncle. The rankings from highest to lowest were: brother, 53; uncle, 47; sister, 47; appellant, 42; mother, 40. The lowest

---

[56] Dr. Craig stated, "There are both children and adult forms. The adult form was normed on the population of age 16 to 89, and there are different norms for each – basically every 10-year span, and so I used the ones from the age 30 to 39, which is Mr. Petetan's age."

[57] It is unclear whether this is a reference to Dr. Scott's evaluation in November 1991, Dr. Correia's notes in connection with the 2012 IQ testing, or some other evaluation unknown to us.

possible score was a 40. Dr. Craig did not use appellant's score "because there are some problems with self-reports." He discounted the mother's assessment because her score was at the floor of the scale and because her responses were not consistent. Dr. Craig also noticed that the uncle's scores had a different pattern from the other respondents, which may have reflected that the uncle had only limited contact with appellant and had a different set of standards. Dr. Craig thought that the brother's and sister's assessments "were probably the most accurate and most reflective of what [appellant's] actual day-to-day functional skills really are." The brother and sister ranked appellant's social skills the highest, his conceptual skills second, and his practical skills as his weakest area. The norm for the population on the ABAS-II was a range of 85 to 115, similar to the norm for IQ tests.

From this assessment, Dr. Craig concluded that areas of strength within social skills were that appellant had friends, had good relations with his family, was able to interpret other people's emotions, and showed some ability with leisure skills, such as listening to music. Limitations in the social area included the inability to understand jokes, being easily led by others, not engaging in games or watching television, and the inability to be polite, to offer assistance, or to give gifts. Dr. Craig found appellant's conceptual strengths to be his ability to talk in complete sentences, his ability to write, his ability to at least appear to listen to what he is told, and his having "pretty good self-direction" (being able to go out alone in the community). Limitations in this area included having very limited conversational skills, being unable to read menus, being unable to calculate correct change, and being irresponsible with time commitments. Dr. Craig found appellant's practical skills to be his ability to walk to familiar locations, make simple meals, take medications, and dress himself. Limitations included being unable to use a map, being a terrible housekeeper, and being unable to make his own bed or to operate appliances such as washers, dryers, and microwave ovens.

Dr. Craig also noted that the only eating utensil appellant used was a spoon, that appellant mainly ate sandwiches, and that appellant did not necessarily dress himself well. And Dr. Craig related that appellant had difficulty with administering first aid.

Dr. Craig concluded that appellant's adaptive limitations far outweighed his minimal skills. Dr. Craig acknowledged that appellant "does have skill areas" and that "writing ability, for example, is one that seems to stand out." What caused the adaptive limitations, Dr. Craig said, was "hard to say, but one likely explanation is that there were many missed opportunities to learn these skills" due to appellant spending "the majority of his life incarcerated." Dr. Craig also indicated that appellant's "parental supervision was not such that he was expected to do it, or, you know, the training was given to him, so he simply didn't learn those skills." Dr. Craig concluded that the adaptive assessment scores fell within the range for *moderate* mental retardation—below the "mild" retardation level.

On cross-examination, Dr. Craig conceded that the ABAS-II is not normed for retrospective assessments and that no test currently exists that is normed for that purpose. When asked what percentage of the population aged thirty to thirty-nine for which the particular ABAS-II assessment was normed had been incarcerated for twenty years of their life, Dr. Craig replied, "I would say zero." Nevertheless, Dr. Craig stated that he asked the informants to rate appellant's abilities at the time he went into prison. The prosecutor construed this to mean when the defendant entered juvenile custody at age fourteen or fifteen, but it may have been when the defendant went to the penitentiary when he was sixteen.

In any event, the prosecutor went through the ABAS-II questionnaire and pointed to items that could be inappropriate for a fourteen to sixteen year old and for which appellant was given the

low score of 1 out of a possible score of 0 to 3:

> • Calls to find out if a repair or order is ready.

> • Calls a repair person if, for instance, the air conditioner or heater is not working.

> •Takes people on trips to nearby places; for example, takes a child or family member to a park.

> • Asks a store clerk for product information before buying an item.

> • Reads and follows instruction to assemble new purchases.

> • Makes reminder notes or lists.

> • Completes forms for business or services; for example, obtains a lease.

> • Reads important documents; for example, credit card applications or rental agreements.

> • Balances a checkbook.

> • Follows the maintenance schedule for home or car.

> • Reserves tickets in advance for activities such as concerts or sports events.

Dr. Craig also acknowledged that the ABAS-II was created in 1999, when the internet existed and tickets could be reserved online. When asked by the prosecutor, "That didn't exist back at the time we're assessing this man, did it?" Dr. Craig responded, "You could do it by telephone."

The prosecutor also elicited testimony that, despite the fact that appellant was not reported as playing games, the questionnaire also included the item "keeps score when playing games," for which appellant was given a score of 1. Appellant was also given a score of 1 for the item "shows sympathy for others when they are sad or upset," but Dr. Craig admitted that such a score would also be consistent with having antisocial personality disorder and that appellant had been diagnosed (as an adult) as having antisocial personality disorder, as well being diagnosed (as a child) as having

conduct disorder.[58]

The prosecutor also questioned Dr. Craig about the fact that appellant received a score of 1 on almost every home living task, including folding clean clothes, taking out the trash, clearing the table after a meal, making the bed, making minor repairs, putting things in their proper place, sweeping the floor, cleaning his room, cleaning the bathroom, mixing and cooking fairly complex foods, and dusting the furniture. The prosecutor quoted from the manual, *ABAS-II, Clinical Use and Interpretation*, as saying: "It is not uncommon for adolescents and young adults with antisocial personality disorder or conduct disorder to have adaptive skill problems in the area of health and safety, occupational performance, daily living, self-direction, and interpersonal skills." When asked if he agreed with that statement, Dr. Craig responded, "I think there is some truth to it." And Dr. Craig acknowledged that an overprotective family could result in an individual not learning a lot of adaptive behaviors because the family members do things for him.

Dr. Craig also admitted that the pool of informants used to rate appellant's adaptive behavior was identified by the defense team's mitigation specialist, and that every single person in that pool was related to the defendant. Dr. Craig also testified that one of the things to be careful about in conducting an adaptive behavior assessment is that some of the informants may have a vested interest in the outcome of the interview.[59] And Dr. Craig admitted that the interviews (except for

---

[58] Outside the presence of the jury, Dr. Scott had testified that antisocial personality disorder was not considered an appropriate diagnosis for anyone under age eighteen, but someone who displayed what would be diagnosed as antisocial personality disorder in an adult would be diagnosed as having conduct disorder.

[59] In direct examination, Dr. Craig had testified, "Well, you want to make sure that the person, first off, doesn't have a vested interest in giving you incorrect information, that you can assume that they are going to give you correct information, and to some extent, that's a bit of a leap of faith."

appellant's) were conducted by telephone but that, ideally, interviews would be conducted in person because that allows the interviewer to "pick up cues from people by facial expressions, body posture." Nevertheless, Dr. Craig maintained that "you can get a lot of the same thing from just listening to voice quality." Dr. Craig also admitted that one of the ways to ensure the reliability of interview results was to conduct the ABAS-II interview multiple times with the same informant,[60] but Dr. Craig conducted the interview only once per informant. On redirect examination, Dr. Craig noted that he had a difficult time locating appellant's sister when trying to conduct an interview, and he wanted to find a teacher or a peer from before appellant's imprisonment but could not locate anyone in those categories who remembered appellant well enough to give an assessment.

g. *Dr. Mayfield - Defense-Ordered IQ and Other Testing*

Dr. Joan Mayfield, a neuropsychologist, conducted IQ tests and other testing at the request of the defense. She also reviewed appellant's educational history and prior testing. Appellant's educational record showed that he had to repeat third and sixth grades and that he was socially promoted to fourth grade. He dropped out during ninth grade. Dr. Mayfield testified that she reviewed the 2012 test with a full-scale IQ score of 55 and stated that "the scores are really consistent from the scores when he was 16."

Dr. Mayfield administered the WAIS-IV[61] IQ test and obtained a full scale IQ of 52. The subtests showed verbal comprehension at 54, perceptual reasoning at 56, working memory at 71, and processing speed at 52. She also administered other tests that used the same basic scoring system as an IQ test. Achievement tests showed appellant to be in the high 50s or low 60s (Brief Reading

---

[60] Dr. Craig stated, "That's how the people that developed the test establish reliability."

[61] Wechsler Adult Intelligence Scale - Fourth Edition.

score of 63, Brief Mathematics score of 56, and Brief Written Language score of 61). On the Brief Written Language test, Dr. Mayfield found that appellant "had difficulty organizing sentences that had full words in it and made a thought, a complete sentence." The TOMAL-2,[62] a memory test, gave scores on several components of memory ranging from 52 to 72, with most scores being in the 50s and low 60s.[63] Most of these memory test scores placed appellant below the lowest one percent of the population. The CREVT,[64] a language test, yielded a general vocabulary score of 45, which also placed appellant below the lowest one percent of the population.[65]

Appellant scored low on various tests that measured attention and executive functioning, which did not use the same scoring system as an IQ test. These tests included the Halstead-Reitan Battery, the Delis-Kaplan Executive Function System, the Conners' Continuous Performance Test - Second Edition (CPT-II), the Wisconsin Card Sorting Test, and the Comprehensive Trail-Making Test (CTMT). Appellant's scores on the Halstead-Reiten Battery were in the impaired range, and, with one exception, all of his scores on the Delis-Kaplan were a 1 or 2 when the average score would be a 10.[66] Appellant's scores on various subtests in the CPT-II resulted in a score of 99.9 out of 100 that a significant attention problem exists. Scores on subtests within the Wisconsin Card Sorting test

---

[62] Test of Memory and Learning - Second Edition.

[63] Scores were as follows: Verbal Memory Index 63, Nonverbal Memory Index 54, Composite Memory Index 52, Delayed Verbal Recall Index 51, Attention/Concentration Index 72, Sequential Recall Index 62, Free Recall Index 54, Associative Recall Index 65, Learning Index 63.

[64] Comprehensive Receptive and Expressive Vocabulary Test.

[65] Appellant also had low scores on motor and visual perceptual tests: Motor-Reduced Visual Perception of 53, Visual-Motor Integration of 42, and General Visual Perception of 44.

[66] He scored a 7 on one subtest.

placed appellant in percentiles ranging from the bottom 2 to 10 percent of the population. And appellant's scores on the CTMT were so bad that Dr. Mayfield chose to discontinue it.[67]

In light of all her testing, Dr. Mayfield concluded that appellant "presents with global delays, global delays in intellectual ability and academic and attention and executive functioning and problem solving, memory, language, motor, and visual perception. There was global delays across all domains."

However, Dr. Mayfield admitted that "it doesn't do any good to take a test if somebody is not putting forth their best effort." In an attempt to measure whether appellant was putting forth his best effort, Dr. Mayfield administered the Test of Memory Malingering (TOMM) and the Rey 15 test. The results of the TOMM test showed appellant to be in the category of "inadequate effort strongly suspected." Appellant was also below the cutoff for adequate effort in the Rey test, i.e. the score was positive for malingering.[68] But Dr. Mayfield discounted these scores. With respect to the TOMM, she said, "The research supports that the TOMM is not really a good test to use with people who are mentally retarded. It is still used, and I used it." She believed the problem with the TOMM is that "it tends to give false positives." Regarding both the TOMM and the Rey 15, Dr. Mayfield stated that "the research is not really good on any of them, that they are really good" that the tests "give[] you a lot of false positives" and "most of the research, when they norm . . . the people who have mental retardation are excluded from that sample." She testified that the WAIS-IV also has an

---

[67] Appellant also had below average scores on a "Tapping" test, a significantly impaired score for his dominant hand on the "Grooved Pegboard" test, and a low average result for his non-dominant hand on that test.

[68] To show adequate effort on that test, a person was expected to get at least three sets of three pictures correct, but appellant was correct on only two sets and part of a third set.

embedded validity test called Reliable Digit Span. Appellant met the cutoff on two of the three subtests, which indicated adequate effort, but missed the cutoff on the other subtest. The combination of scores on the subtests yielded an overall score of 12, which exceeded the requirement of an overall score of 10 or better to indicate adequate effort. Dr. Mayfield concluded that appellant exerted good effort on all of the tests.

When asked on cross-examination whether any of the capital-murder defendants she had previously tested and interviewed had been deceptive with her, Dr. Mayfield responded, "I think that the majority of the ones – these last that I have seen, I have gotten valid testing." Nevertheless, Dr. Mayfield acknowledged that studies had been conducted to estimate the frequency of deception in these types of settings and that the studies had demonstrated a combined rate of probable and definite malingering for pre-sentenced males referred for neuropsychological assessment to be as high as 54 percent. Dr. Mayfield agreed that appellant had a documented history of deception and manipulation starting at age ten, when he committed burglary. Dr. Mayfield also agreed that depression or lack of education could lower an IQ score. And, finally, she acknowledged that appellant's scores on her intelligence tests were the lowest that he "has ever achieved in his lifetime."[69]

### 9. *Childhood Acquaintance – Fredrick Nico*

Fredrick Nico, the childhood acquaintance whom appellant shot, did not ever consider appellant to be mentally retarded:

Q. As a child, did you ever look at him as a mentally challenged person?

---

[69] When asked for the lowest possible score that one could make on the WAIS-IV, Dr. Mayfield, responded, "I don't know if it's less than 45 or less than 40." When asked whether the lowest possible score one could make on the WAIS-III was 47, Dr. Mayfield responded that she did not know but "that could be right."

A. No.

Q. Did you ever think of him as a poor, disabled individual?

A. No.

Q. As a retarded kid?

A. No.

Q. How would you describe Carnell?

A. As far as a kid, he was an average kid, you know, until he started getting in high school, middle school and start, you know, want to go run the streets wild like everybody else did and took it a step further.

Q. Took it a step further?

A. Uh-huh.

Q. You said you wouldn't describe him as retarded. Would you describe him as mean?

A. Hateful. Not mean.

### 10. *School Officials*

Dorothy Stamps, appellant's first grade teacher, was routinely assigned "bad" children that other teachers could not handle. She was the last stop before a child was sent to an alternative school. Appellant did not give Stamps any problems in the fall, but, in the spring, he began laughing frequently during classes. One time Stamps said, "If you're going to do that, stand up and laugh until you get tired." Appellant stood up and laughed for about five or six seconds and then ran out of the room. When the prosecutor asked Stamps if she thought that appellant was "retarded," Stamps responded, "If he was, he was a smart retarded person. He was wise." When asked what she meant by "wise," Stamps responded, "He knew what he was doing." She also testified that appellant was

capable of doing the schoolwork if he applied himself.

Morris Lee, an assistant principal at appellant's elementary school, regularly came in contact with appellant because he was an "uncooperative" student. Appellant showed defiance to "virtually every adult in a supervisory position" at the school. Lee characterized appellant's mother as an "enabler" who "catered" to appellant. When asked if he thought appellant had a mental disability, Lee said, "Beyond being hard headed, no, sir. He was a – he's not stupid. I mean, he's not. Now, he was an average child" who did not apply himself in appropriate directions.

Eddie Fowler, a principal at a middle school that appellant attended, testified that appellant was placed into a special education program called "the self-management program." This placement was "not necessarily because he was so far behind, but because he was a discipline problem." Based upon a review of the school records, Fowler concluded that appellant was "pretty average." Fowler said that appellant's testing in grade 4.6 showed him to be at grade level 4.3 or 4, so appellant's placement into special education "wasn't because of his academics."[70] When asked, "So he wasn't in Special Education because of any mental defect or because he was retarded, was he?" Fowler responded, "No."

Fowler characterized appellant's behavior as "very poor." Fowler once caught appellant smoking in a school restroom. Appellant denied that he was smoking, but Fowler had seen the smoke come out of appellant's mouth.

In 1989, Ramona Pitre was appellant's teacher at an alternative school for students with behavioral problems. Appellant was angry and sometimes would not do his work. He would talk

---

[70] Fowler's recitation of scores for fourth grade as being only slightly below grade level appears to be inconsistent with the CAT transcripts in the record. *See supra* at part II.B.5.

back to Pitre, and he was "always veering away from the rules." One time, appellant threw a tray of food on Pitre's head, an occurrence that she had never experienced before or since. When asked whether she thought appellant was mentally retarded, Pitre replied, "Oh, no." When asked to elaborate, she explained, "Because his behavior was the norm of students who don't want to be punished for whatever they did to be out of the way of somebody else, yet be in the solitude area" of the alternative school. When asked whether appellant appeared to be one of those students that had a learning disability, she responded, "Oh, no, no."

### 11. *Criminal Justice Officials and Prison Inmates*

In February of 1994, Speedy Bryant was appellant's cellmate. He was appellant's cellmate for only a week and a half, because, during that time, appellant raped him.

Warren Kroll was working in the Ferguson Unit of TDCJ while appellant was incarcerated there in 1994. On July 6 of that year, in a routine shakedown of appellant's prison cell, Kroll discovered two homemade weapons hidden underneath appellant's mattress: (1) a sock with a padlock attached to it and (2) a sharpened piece of steel five-and-a-half inches long with a towel wrapped around part of it. Appellant admitted that the weapons were his and that he had memorized the combination to the padlock, which was needed to remove the padlock from the sock. Appellant made these weapons while he was in "closed custody," which was an area of the prison unit for chronic rule violators.

In March 1995, the first day inmate Daniel Gunter was assigned to the prison block in the McConnell unit, he met appellant. Appellant told him that, if he needed anything, appellant could get it. "It didn't matter what it was or where it came from, he could get his hands on it." Appellant later indicated that he was interested in a sexual relationship with Gunter. When Gunter repeatedly

turned him down, appellant began issuing threats. At some point, someone had knocked Gunter unconscious, and he later awoke to find himself in appellant's cell with his pants off and with appellant holding a homemade weapon to his throat. The weapon was made out of a part of a frame that was torn off the window in the day room of the prison. Something was wrapped around the frame piece to serve as a handle. Appellant sexually assaulted Gunter and, brandishing the weapon, threatened to kill him if he told anyone.

On September 27, 1998, appellant had a fight with another inmate, Azikiw Daniels, at the Estelle Unit in TDCJ. Daniels hit appellant in the head with a pipe. However, after later discussions in the day, Daniels believed that the altercation between him and appellant had been resolved.

Two days later, however, Robert Blanks, a TDCJ officer who worked in the food service department, saw appellant and another inmate walk into the kitchen area wearing hairnets. Appellant had previously worked in the kitchen, but he was no longer assigned there.[71] A security guard, assuming that the two men were assigned to work there, had let them in, but Blanks, knowing that was not their work assignment, moved to intercept them. Before Blanks could do so, however, appellant and his cohort pulled out homemade knives and stabbed two other inmates, one of whom was Daniels.

Daniels had originally become acquainted with appellant in prison because appellant talked about owning a record company called Cartel Records. Daniels had asked appellant "how you get that started," and appellant showed him how to file a DBA form. Daniels later read a book on the subject, which confirmed that appellant's instructions were correct. Appellant had also generally explained that an artist receives only a percentage of money from each record sale.

---

[71] The other inmate had never worked in the kitchen.

In 2004, appellant sexually assaulted another cellmate, Concepcion Rosas.

Mattie Howe was appellant's parole officer in 2012. Howe had one-on-one meetings with appellant and was also a facilitator in an anger management class appellant attended. Howe had no trouble communicating with appellant, and appellant had no trouble understanding concepts and communicating in the anger management class. When asked whether he felt appellant was mentally retarded, Howe responded, "Not from what I have seen of mentally retarded people, no, sir." Howe also testified that appellant never had a positive result on a drug test during his supervision.

Mubarak Ali was incarcerated for three to four days at the McLennan County jail with appellant while appellant was awaiting trial in the present case in 2014. Ali testified, "Mr. Petetan told me, he say if he act like he's mentally sick, he cannot get the death penalty." Appellant also said that his aunt in Louisiana was a bondsman who could help Ali bond out of jail. When Ali asked appellant to contact his aunt on Ali's behalf, appellant said that he could not use the phone because "he's telling the Court that he's mentally sick." At Ali's prodding, appellant later called his mother and mentioned to her Ali's bond situation. Ali bonded out of jail the next day.

### 12. *Appellant's Tattoos*

Appellant had a number of tattoos that appeared to signify his understanding of various subjects. He had a dollar sign between his eyes and three teardrops under his left eye. Jay Hart, a gang expert employed by TDCJ, testified that the teardrops signify "doing time or the death of a loved one." The letters "TGR" were tattooed over appellant's left eye and a cross was tattooed on the right side of his neck. Appellant also appeared to have a tattoo of the letters "GC," which may have stood for his affiliation with the 357 Graveyard Crip gang. "Boss Hustler" was tattooed across appellant's neck, and Hart stated that "hustler" could refer to a gang member who deals drugs,

hustles money, or engages in illegal activities. A crown was tattooed on the left side of appellant's neck, along with the words "PA Don," which appeared to be a nickname. On appellant's chest was a picture of Jesus and the devil playing chess with the devil winning. On appellant's stomach was a portrait of Ulysses S. Grant, with the word "Underground" on top and "Legend" on the bottom. On appellant's back were the words, "Don Cartel." Appellant also had tattoos of the words "Rolls Royce" and "Bentley." On appellant's right shoulder was a portrait of Benjamin Franklin that is commonly seen on the one-hundred-dollar bill. The Franklin portrait had tattoos corresponding to a mirror image of the tattoos on appellants face. Appellant also had a tattoo of the character Tony Montana in the movie Scarface. Underneath that portrait were the words "Tripple Gold" and "3G." Across appellant's right arm was the word "Cartel," and appellant had a fresher tattoo of "Kimberly." Appellant also had a tattoo of "409"—the Port Arthur area code. Appellant had tattoos of a microphone and music notes. There were also tattoos of the words "Trill Life," a money bag, a spade, a street address, a couple of dice reading "3" and "5," a marijuana leaf, a liquor bottle, the words "Short Texas," a skull on a poster, and the words "High Rollers."

### 13. *Appellant's Letters*

Several of appellant's letters to Kimberly were read aloud by the prosecutor, and the jury had access to many more written letters. It is not practical to include in this opinion all of the letters read by the prosecutor, much less all of the letters to which the jury had access. But by way of example, we include a portion of the first letter read by the State, which gives the reader a sense of appellant's writing style and of his ability to perform calculations and to think creatively (letter dated 10-31-10):

> Kim, I Hope and Pray when this letter reaches you it finds you in the best of health as well as spirits in God's Care and Protection. as far as myself im Just takeing things one day At a Time, staying solo and low key missing my baby. Check this out

baby. I got an idea that will work only if you Put it to action and execute, it's a Raffle a watch its sold at wholesale price and when you Raffle it off you can sell Tickets at 25.00 let's say you sale 100 tickets that's $2,500 all you will need is some <u>flyers</u> the <u>watch</u> and a <u>cell phone</u>. I got a hundred on my books I'll get that out so you can order the watch. get the flyers printed up and Pass them out have a Picture of the watch on their Real Diamond watch 0.12 carats. your cell #, and ticket info your homegirl who do hair you told me about, she can hand out a few flyers, Kristain, you can at school and other places. I wrote out a sample of how it goes. I just wanna try DA come up with something to help out Just let me know whats up, and I'll come your way to get the watch.[72]

### 14. *Documents in Appellant's Suburban*

After appellant was arrested for this offense, law enforcement found the several documents in his white Suburban. One of those documents was a printed out set of directions, by Google or Mapquest, from Waco to Port Arthur. There was also a document entitled "Cartel Boxing Promotions Business Plan Prepared By Petetan." The document included sections entitled, "Executive Summary," "Company Summary," "Services," "Marketing Analysis Summary," "Marketing Strategy," "Management Summary," "Financial Plan," "Vision," "Boxing," and "Biography." The "Biography" section contained the following:

BIO

Born in Port Arthur, Texas, Carnell Petetan, Jr. has his share of ups-and-downs. The tough street of his hometown groomed him into the dynamo he is today, and now, armed with a wealth of resources, skills and abilities, he is set to launch the long anticipated CARTEL BOXING PROMOTIONS.

Co-Founder of Tripple Gold Records, along with brother and business partner, Herbert Mouton, Carnell Petetan has emerged with a vision so ambitious, success is eminent [sic].

---

[72] Stylistic errors in original. Two instances of "I'll" may be read as "ill"—due to the ambiguous nature of the handwriting. We have attempted to faithfully reproduce this passage from appellant's actual written letter contained in State's exhibit 126 rather than from how this passage appears in the court reporter's record (*see* p. 335, pdf file, combined exhibit volumes).

The key feature and strength behind Cartel rests in the fact that for eighteen years of his life, he survived in Texas prisons; some of the deadliest in the nation. This is where he honed his leadership abilities and educated himself.

Now this wise and intelligent young man is ready to take on the world. Surrounded by a support team of experts, his Cartel Boxing Promotions will quickly become an industry great in the years to come.

You've seen the rest, now prepare for the best.

Carnell enjoys reading, video games, and brainstorming. The author of over 800 songs, Carnell is also the respected and rising rap star, "Don Cartel". Look for the documentary, "unshackled", [sic] coming soon. With success looming over him, Carnell promises to stay grounded and Always put God First.

## C. Analysis

### 1. *General Intellectual Functioning (IQ)*

The adult IQ test administered by Dr. Coxe in 1992, when appellant was sixteen years old, yielded a full-scale IQ score of 74, which is above the score of 70 that is generally considered the ceiling for mental retardation. If one accepts Dr. Coxe's testimony that this IQ test had a three-point margin of error, then the score at the low end of the margin-of-error range would be 71—still above the general ceiling for mental retardation, albeit barely. This was some evidence that appellant's general intellectual functioning fell above the range for mental retardation.

Although every other IQ test that appellant took yielded lower scores that were within the range of mental retardation, the jury had reason to believe that the adult test administered by Dr. Coxe yielded the most reliable result of all the IQ tests that appellant had taken. Dr. Coxe believed that the result was more reliable than the result obtained from the child version of the IQ test that he had previously administered because appellant did not put forth his best efforts when taking the child version of the test. Little is known about the circumstances surrounding the IQ test administered in

1991 or the IQ test administered by TDCJ. Appellant had a motive to perform poorly on the 2012 IQ test in order to receive Social Security disability payments, and Dr. Correia observed that appellant's efforts during that testing were "to cooperate minimally and superficially only."[73] Appellant had an even greater incentive to score low on the tests administered by Dr. Mayfield, in order to avoid the death penalty, and correspondingly, that testing yielded the lowest IQ score appellant had ever received. And appellant's scores on two tests administered by Dr. Mayfield to detect malingering were positive for malingering.[74] Dr. Coxe testified that he did not think that appellant was an honest individual, and Dr. Mayfield acknowledged that appellant had a documented history of deception and manipulation.

Also, the jury could reasonably infer from the testimony of psychological experts and education personnel, and the up and down fluctuation of CAT scores from year to year, that appellant was generally uninterested in exerting full effort on testing and that he became easily discouraged when questions became somewhat difficult. As a result, the jury could have reasonably believed that, even when he had no specific motive to lower his score, appellant's test scores understated his intelligence.

Further, the jury could have reasonably believed that appellant's failure to score well on CAT and the later achievement tests was due to his failure to learn the material that he was being taught in school and that that failure to learn was in turn due to his failure to attend school and his attitude. Notably, appellant's grades and his scores on CAT tests seemed to be worse in general in years in

---

[73] Evidence in the record suggests that appellant was successful in receiving social security disability benefits.

[74] Appellant's performance on part of the digit-span subtest for the WAIS IV was also positive for malingering, though his score on the digit-span subtest as a whole was acceptable.

which appellant had more absences (his initial third grade year and his fourth grade year). Moreover, appellant did not complete school beyond the ninth grade, and when he was in school, he was often in special classes or an alternative school because of attitude problems. Consequently, even though Dr. Coxe was influenced by appellant's 1992 achievement test scores in concluding that appellant was mildly mentally retarded, the jury could have reasonably believed that those low scores reflected appellant's failure to learn as a result of his attitude and were not an indication of mental retardation.

In addition, the jury could have given weight to the testimony of four different education professionals—two teachers, a principal, and an assistant principal—that appellant was not mentally retarded but was a person of average intelligence with major attitude problems. Appellant's diagnoses for conduct disorder and antisocial personality disorder further buttress these assessments that appellant's problem in school was caused by his attitude and not by a lack of intelligence. The jury also had the testimony of childhood acquaintance Nico that appellant was not mentally retarded, as well as the testimony of one of appellant's cousins that he did not remember thinking of appellant as a retarded individual. And the jury also had evidence that, at least at some point while growing up, appellant abused alcohol.

The jury also had appellant's letters, the documents found in his car, and his trial testimony to evaluate. Although appellant's letters are not the writings of a scholar, and they likely reflect his substandard educational background, a jury could reasonably believe that these writings were not the writings of a mentally retarded person. Appellant's business plans revealed an individual who thought strategically about making money. And the jury was in a position to observe appellant while he testified. Although we are not in a position to evaluate his demeanor on the stand, appellant's testimony in the record seems to be reasonably coherent and effectively communicated.

Appellant also showed a degree of sophistication in carrying out crimes, in prison life, and in his relationship with Kimberly. He wore a hairnet to successfully lull a prison guard into allowing him into the prison kitchen so he could stab a fellow inmate. While in prison, he created a weapon out of a sock and a padlock and created a different weapon out of a part of a window frame and a towel. He accurately explained to a fellow inmate how to file a DBA form. Through the communications he had with Kimberly while he was in prison, appellant and Kimberly developed a romantic relationship that led to marriage. When that relationship soured, appellant successfully cut off Kimberly's cell phone service. After he assaulted Kimberly in Port Arthur, appellant cut himself with a knife to help supply evidence for a defensive theory that Kimberly was the aggressor, which was consistent with his later testimony at trial.

And appellant engaged in a relatively sophisticated scheme to murder Kimberly and frame Miller for that murder. Appellant used a stranger to help him scout out Kimberly's apartment, and he tricked a neighbor into knocking on Kimberly's door so that she would open it without knowing that appellant was there. Appellant schemed to frame Miller for the murder by using the false promise of drugs to lure Miller to go with him to Waco, attempting to transfer gunshot residue to Miller's hands, and telling a clerk to call 9-1-1. This attempted frame-up of Miller was consistent with appellant's trial testimony that Miller was actually the murderer.

And after appellant was caught, he then conceived of the idea of eluding the death penalty by claiming mental sickness. Appellant's statement while awaiting trial on the current capital murder charge that he could not get the death penalty if he was mentally sick—and supporting the claim by refraining from using the phone—indicated an accurate understanding of either the principle that mentally retarded persons could not be executed or the principle that a person could

not be executed if he was mentally incompetent to stand trial or to be executed.[75]

It is true that three psychological experts—Dr. Coxe, Dr. Correia, and Dr. Mayfield—diagnosed appellant as mentally retarded, with significantly subaverage intellectual functioning. Dr. Scott also suggested that appellant was mentally retarded but hedged his bets with the more ambiguous diagnosis of "mild mental retardation versus borderline functioning." No psychological expert testified definitively—during appellant's capital murder trial—that appellant was *not* mentally retarded.[76] And we have recognized that test scores showing an IQ above 70 do not necessarily preclude a diagnosis of mental retardation.[77] But "[a]lthough experts may offer insightful opinions on the question of whether a person meets the psychological diagnostic criteria for mental retardation, the ultimate issue" is for the factfinder.[78] We also recognize that Dr. Mayfield somewhat discounted the test score of 74 because of a not uncommon variance that could occur between child and adult versions of intelligence tests at the time the 1992 adult test was administered. And we acknowledge that Dr. Mayfield also discounted the accuracy of the tests for malingering. Nevertheless, we conclude that a finding that appellant did not suffer from significantly

---

[75] *See Owens v. State*, 473 S.W.3d 812, 816 (Tex. Crim. App. 2015) ("It violates principles of due process to put an incompetent person to trial."); *Mays v. State*, 476 S.W.3d 454, 457 (Tex. Crim. App. 2015) ("A person who is incompetent to be executed may not be executed.").

[76] During appellant's incompetency trial, Dr. Michael Pittman testified that appellant was not mentally retarded. *See infra* at part III.A. This testimony was not mentioned during appellant's capital murder trial.

[77] *Ex parte Cathey*, 451 S.W.3d 1, 10-11 & nn. 21-22 (Tex. Crim. App. 2014).

[78] *Briseno*, 135 S.W.3d at 9. *See also Ex parte Moore*, 470 S.W.3d 481, 487 (Tex. Crim. App. 2015) ("opinions of mental-health experts inform the factual decision, [but] they do not determine whether an individual is exempt from execution under *Atkins*."); *Cathey*, 451 S.W.3d at 9-10 ("Although psychology and psychologists inform the factual decision, they do not determine whether an inmate is exempt from execution under *Atkins*.").

subaverage general intellectual functioning sufficient to meet the first prong of *Atkins* was not against the great weight and preponderance of the evidence so as to be manifestly unjust. We conclude that there was legally and factually sufficient evidence for the jury to find that appellant did not suffer from significantly subaverage general intellectual functioning because his IQ was above 70 and his actual intelligence was in line with, or better than, the IQ test score of 74. This conclusion alone is enough to reject appellant's sufficiency claims because he must prevail on all three prongs of the *Atkins* inquiry to obtain relief. However, we will also address the sufficiency of the evidence on the issue of adaptive functioning.

## 2. *Adaptive Functioning*

The record indicates that, as a result of scoring 69 on an IQ test administered upon entry into prison, appellant was administered a "secondary test" involving adaptive behavior screening. We do not know the details of that test or how appellant scored, but the jury could have reasonably inferred that the test results did not indicate significant adaptive deficits because appellant was not assigned to the "developmentally disabled" program in the Hodge Unit.

We do have detailed testimony about the ABAS-II administered by Dr. Craig. However, the administration of the ABAS-II in appellant's case suffers from several general methodological flaws. First, the assessments of appellant's adaptive functioning were retrospective—based on informants' memories of appellant's adaptive functioning at around ages fourteen to sixteen. Dr. Craig admitted that the ABAS-II was not normed for retrospective assessment. Second, Dr. Craig used the version of the test normed for persons aged thirty to thirty-nine, but that age range far exceeded the age or ages for which appellant was being assessed—ages fourteen to sixteen. One would expect that an adult at or approaching middle age would have many more life skills than a teenager, so rating a

teenager on such an adult test would seem to be inherently likely to produce a result indicating a lack of adaptive skills. The State's cross-examination addressed items in the ABAS-II questionnaire that seemed appropriate for an adult but inappropriate for an adolescent. A third flaw is that the test was normed in 1999, but the behavior being assessed occurred in 1993 or earlier. One major social and technological change occurred between these years—the rapid expansion and widespread use of the internet. A fourth general flaw in the administration of the ABAS-II to appellant is that only appellant and family members were consulted. Dr. Craig acknowledged the need to be careful about using informants with a vested interest in the outcome, but all of the informants here had a vested interest—appellant to save himself and the others to save a family member from the death penalty. A fifth flaw is that only one interview was conducted for each informant. Dr. Craig admitted that one of the ways to ensure reliability was to conduct the interview with each informant multiple times. Finally, Dr. Craig admitted that in-person interviews were the ideal, so that the interviewer could pick up cues by looking at facial expressions and body language, but the interviews (except for appellant's) were conducted over the telephone.

There were also specific reasons to question the reliability of the ratings given by the various informants. Dr. Craig discounted appellant's mother's assessment because it resulted in the lowest possible score of 40 and because she was not consistent in her responses. He discounted the uncle's assessment because his responses reflected a different pattern than the other informants. And he did not use appellant's assessment because of problems with self-evaluation. We also observe that the score from appellant's self-assessment was 42, only two points higher than the floor of 40.

That leaves the assessments by appellant's brother and sister. The brother did not testify, but the sister's (Sabrina's) testimony provides several reasons to think that her assessment was

inaccurate.  Sabrina said that appellant had a problem with wetting himself, even when he was older, but this assertion was not corroborated by any non-family member, and evidence from Dr. Correia's report indicates that appellant knew how to take restroom breaks.  Sabrina said that appellant could never count money, but appellant's own statements and the testimony of Miller indicate that appellant had no problem counting money.  She suggested that appellant had no special interests and did not play games, but appellant's own statements indicated that he was interested in music, boxing, and bowling.  Sabrina indicated that appellant could not use a cell phone, but there was evidence from several sources that appellant did in fact know how to use a cell phone.  She made statements about appellant's writing, but those statements were contradicted by the letters he wrote to Kimberly.  At trial, Sabrina acknowledged that appellant might have improved in some of these areas but that she had not observed it.

Moreover, appellant's lack of some life skills after he was released from prison can be explained by the fact that he simply lacked the opportunity to learn some of these life skills because of his long incarceration in prison that began when he was a juvenile.  Appellant's initial lack of familiarity with buffet restaurants and cell phones, and his failure to cook his meals and clean his apartment, could all be explained in this fashion.  Another explanation or partial explanation for these things could be that appellant was lazy and self-centered and was content to allow others to do these tasks for him.

For the above reasons, the evidence was both legally and factually sufficient for a jury to conclude that appellant failed to show deficits in adaptive functioning indicative of mental retardation.  In any event, we also consider the factors outlined in *Briseno* to determine whether any adaptive deficits are an indication of mental retardation or are, instead, an indication of a personality

disorder.[79] The psychological evidence indicates that appellant has had "antisocial personality disorder" as an adult and "conduct disorder" as a juvenile, and almost all of the *Briseno* factors weigh against a finding of mental retardation. Although all of the family members who testified at trial said they considered appellant to be mentally "slow" when he was a child,[80] and some of them indicated that this was a serious problem that required him to be in special education classes, all of the school personnel who testified said that appellant was an average student with attitude problems. Others such as a childhood acquaintance (Nico) and appellant's parole officer also did not perceive appellant to be mentally retarded.

Some of appellant's crimes (e.g., shooting Nico) might be considered impulsive acts, but much of his criminal conduct, including raping or assaulting other prisoners, and murdering Kimberly, showed forethought and planning. Although Dr. Craig concluded that appellant was "easily led," appellant's criminal conduct uniformly indicates otherwise. Many crimes, such as the rape of fellow inmates, were committed by appellant alone. Appellant had a co-conspirator when he assaulted Daniels in the prison kitchen, but it was appellant who had the grudge against Daniels and appellant who had previously worked in the kitchen. Appellant also acted in a leadership role when he lured Miller into going with him to Waco pursuant to appellant's plan to murder Kimberly.

In addition, the evidence shows appellant's conduct in response to external stimuli to have been rational, though often socially unacceptable, and appellant has shown the ability to respond coherently, rationally, and on point to questioning. The main contrary evidence on the latter point

---

[79] *Griffin v. State*, 491 S.W.3d 771, 799 (Tex. Crim. App. 2016); *Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010); *Briseno*, 135 S.W.3d at 8.

[80] Caston, however, had said that he had not considered appellant to be retarded.

was the testimony of a prison pastor who met appellant only a few weeks before his capital murder trial when appellant had every incentive to fake mental retardation or mental incompetency.

Further, appellant has repeatedly shown an ability to hide facts or to lie effectively in his own interests. Appellant effectively hid weapons in prison and used them to assault and rape other inmates. He effectively presented a false persona to Kimberly while he was in prison that caused her to fall in love with him. He effectively lied to Miller to lure him to Waco and to a store clerk to call 9-1-1 on his behalf as part of constructing a frame-up story. Appellant's history is in fact one of a deceptive and manipulative person. And finally, the present offense shows forethought, planning, and complex execution of purpose, as we have already explained.[81]

We conclude that there was evidence that appellant did not suffer from deficits in adaptive functioning that were indicative of mental retardation, and the conclusion that he did not suffer from such deficits was not so against the overwhelming weight and preponderance of contrary evidence so as to be manifestly unjust.

### 3. *Conclusion*

Having found the evidence to be legally and factually sufficient to support a negative finding on both the general intellectual functioning and adaptive functioning prongs—when a negative finding on either prong would suffice—we conclude that the evidence was legally and factually sufficient to support the jury's negative answer to the issue of mental retardation. Points of error ten and eleven are overruled.

### III. INCOMPETENCY TRIAL

#### A. General Background

---

[81] *See supra* at part II.C.1.

Before his capital murder trial, appellant had a jury trial on whether he was incompetent to stand trial on the capital murder charge.[82] In such a proceeding, commonly referred to as a competency hearing, the defendant has the burden to prove incompetency by a preponderance of the evidence.[83] A person is incompetent to stand trial for a criminal offense if he does not have: (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, or (2) a rational as well as factual understanding of the proceedings against him.[84] This standard is required both by statute and by a defendant's right to due process under the United States Constitution.[85]

The parties presented conflicting expert testimony on whether appellant was incompetent to stand trial. Dr. Ollie Seay, a psychologist hired by the defense, reviewed records, conducted a clinical interview of appellant, and, because he believed appellant to be mentally retarded, administered the Competency Assessment for Standing Trial for Defendants with Mental Retardation (CAST-MR). Appellant's scores on the CAST-MR were "just a little above persons found incompetent to stand trial, still within that range of persons found incompetent to stand trial, but below those found competent to stand trial." Dr. Seay acknowledged that the test was just one tool and not conclusive. He also said that labeling someone as intellectually disabled does not automatically equate with being incompetent and that there has to be something specific that relates

---

[82] *See* TEX. CODE CRIM. PROC. art. 46B.051.

[83] *Id.* art. 46B.003(b).

[84] TEX. CODE CRIM. PROC. art. 46B.003(a); *Turner v. State*, 422 S.W.3d 676, 689 (Tex. Crim. App. 2013) (citing *Dusky v. United States*, 362 U.S. 402 (1960)).

[85] *Turner*, 422 S.W.3d at 688-89.

to the requirements for competency. Based on the totality of his work on appellant's case, Dr. Seay expressed the opinion that appellant had a limited capacity to understand the charges against him and potential consequences and that appellant did not have sufficient capacity to consult with a lawyer.

Dr. Michael Pittman, a psychiatrist appointed by the Court, reviewed records and conducted a clinical interview of appellant. Dr. Pittman concluded that appellant was not mentally retarded but did seem to have a low intellect and that appellant was competent to stand trial.

### B. Conversation about Replacement of Attorney

Stan Schwieger was appellant's former defense attorney. In point of error one, appellant contends that the trial court erred at the competency hearing in excluding Schwieger's testimony about a conversation with appellant about Schwieger being replaced as appellant's attorney. Appellant claims that the trial court improperly allowed the State to invoke *appellant's* attorney-client privilege.

### 1. *Trial Proceedings*

Schwieger was appointed to represent appellant when he was charged with murdering Kimberly. But when appellant's charge was upgraded to capital murder, Schwieger had to be replaced because he was not on the list of attorneys eligible for appointment in death penalty cases.

At the competency hearing, the defense wanted Schwieger to testify about the difficulty he had in explaining to appellant why Schwieger could no longer represent him. The State objected on the basis of appellant's attorney-client privilege:

> Mr. Schwieger . . . is about to get into privileged matters that occurred between this defendant and himself in violation of the attorney-client privilege, and I'm under no understanding that that privilege has been waived, and, in fact, if he's incompetent, as the defense says, he's not capable of even waiving that privilege.

After some back-and-forth between the prosecutor and defense attorney, the trial court held a hearing outside the presence of the jury.

The trial court began by saying, "Unless there is a knowing and intelligent waiver from this defendant regarding any communication he has had with any counsel appointed to him, we're not even going to get close to this issue. You all better tell me why you think that you can go into these matters." After some arguments from the parties regarding the nature of the testimony to be elicited, defense counsel proffered the following questions and answers that he wished to elicit:

> Q. Stan, can you -- did you have any kind of difficulty at all communicating with Carnell when you started to explain to him why you were having to withdraw from representation?
>
> A. Yes.
>
> Q. Was he able to understand if you put it in common legal terms that you would normally use with an average client?
>
> A. No. I tried to explain that I was not qualified to handle a death penalty case and that there were certain qualifications, just going through the general legalese of this, and I was not getting through.
>
> Q. Okay. In order to get through to him, what kind of terms did you have to use?
>
> A. Well, I understand I was probably a bit more than blunt, but I basically told him eventually that they were going to try to stick a spike in his arm and try to kill him as a result of this offense.
>
> Q. So very graphic terms before he could understand what you were saying?
>
> A. Yes.

The State contended that the questioning involved communications protected by appellant's attorney-client privilege. Defense counsel responded that the State could not invoke appellant's attorney-client privilege and that, in any event, the content of communications were not being revealed.

When the trial court expressed skepticism about the latter proposition, defense counsel proffered a truncated version of questions and answers to elicit from Schwieger:

Q. Did you have difficulty communicating with him?

A. Yes.

Q. Were you finally able to get to him?

A. Yes.

Q. How?

A. By using very graphic terms.

The State contended that the truncated colloquy still revealed the content of communications. When the trial court told defense counsel, "But you wanted the jury to hear exactly what was said," defense counsel responded, "I would have been satisfied with 'graphic terms,' Your Honor."

The trial court then asked, "Well, how does that help you, anyway?" Defense counsel responded, "Because it's obvious to the jury then, that Mr. Petetan has difficulty communicating with an attorney, which is the heart of why we're here, isn't it?" The trial court responded, "Unless you talk to him in graphic terms. Then he gets it. Right?" Defense counsel responded that appellant "got it that time." But defense counsel contended that "this is one very little part of the whole process, but it's an example." Responding that, "It's not like a lay person came by and saw the defendant beating his head against the wall," the trial court sustained the State's objection and excluded the evidence.[86]

### 2. *Analysis*

---

[86] The trial court also gave an instruction to disregard an initial question defense counsel had asked Schwieger in the jury's presence.

We review a trial judge's decision to admit or exclude evidence for abuse of discretion.[87] A trial judge's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement.[88] An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case.[89] The first step in determining whether evidence is admissible is to determine whether it is relevant.[90] Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence.[91]

Schwieger's testimony was offered by appellant for the purpose of showing that he was incompetent to stand trial. But, while evidence that appellant was not able to grasp what counsel was saying until counsel spoke in graphic language may have been relevant to show that appellant had low intelligence, that evidence did not, without more, have any tendency to show that appellant was incompetent. This is because the evidence did not indicate that appellant lacked sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, nor did it indicate that he lacked a rational as well as factual understanding of the proceedings against him.

Low intelligence is not, by itself, an indication of incompetency.[92] The Supreme Court of

---

[87] *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex. Crim. App. 2016).

[88] *Id.* at 83.

[89] *Id.* at 93.

[90] *Id.* at 83.

[91] TEX. R. EVID. 401; *Henley*, 493 S.W.3d at 83-84.

[92] *Alvarez v. State*, 480 S.W.2d 646, 647 (Tex. Crim. App. 1972) ("[T]here is no competent evidence in the record to show that the appellant was incompetent to stand trial or was insane at the time of the commission of the offense. Testimony that one has a low I.Q. does not create a presumption of insanity."). *See also United States v. Bernard*, 708 F.3d 583, 593 (4th Cir. 2013) (quoting *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000): "[N]either low intelligence, mental

Alaska has observed that a defendant "must have some minimum ability . . . to understand the nature of the proceedings sufficiently to participate in certain decisions about the conduct of his defense . . . . But this does not mean that a defendant must possess any high degree of legal sophistication or intellectual prowess . . . . Numerous persons are subjected to criminal prosecution, and properly so, even though they are of relatively low intelligence or are suffering from significant emotional or physical impairment."[93]  And the Supreme Court of Idaho has observed that lack of sophistication does not, by itself, render someone incompetent:

> Many defendants lack the intelligence or the legal sophistication to participate actively in the conduct of their defense.  But enlarging the class of persons

---

deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial."); *Lawrence v. Sec'y Fla. Dep't of Corrections*, 700 F.3d 464, 482 (11th Cir. 2012) (quoting same sentence from *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995)); *United States v. Turner*, 644 F.3d 713, 725 (8th Cir. 2011) ("Neither low intelligence, mental deficiency, nor 'bizarre, volatile, and irrational behavior' compels a finding of incompetency."); *Eley v. Bagley*, 604 F.3d 958, 966 (6th Cir. 2010) ("Nor does the penalty phase testimony about Eley's limited education and low intelligence suggest that Eley was incompetent."); *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997) (quoting *Medina*); *Hodges v. State*, 926 So. 2d 1060, 1069 (Ala. Crim. App. 2005) (quoting *Medina*); *Dolchok v. State*, 639 P.2d 277, 293 n.34 (Alaska 1982) (quoting *Schade v. State*, 512 P.2d 907, 914 (Alaska 1973)) (*see infra*); *Newman v. State*, 2014 Ark. 7, 25-26 (2014) (statement similar to *Bernard*); *Wickham v. State*, 124 So. 3d 841, 862 (Fla. 2013) (quoting *Medina*); *Tye v. State*, 298 Ga. 474, 478, 782 S.E.2d 10, 14 (2016) ("[M]erely having a low IQ may not render an individual incompetent to stand trial."); *State v. Bennett*, 345 So. 2d 1129, 1136 (La. 1977) (on rehearing) ("Mere weakness of mentality or subnormal intelligence does not of itself constitute legal insanity" that would render someone incompetent to stand trial.); *Commonwealth v. Chatman*, 473 Mass. 840, 851, 46 N.E.3d 1010, 1021 (2016) ("One can both have a mental disease or deficiency and still be competent to stand trial; the two are not mutually exclusive.  The same is true about a defendant with a low intelligence quotient.") (citation omitted); *State v. Lambert*, 266 S.C. 574, 579, 225 S.E.2d 340, 342 (1976) ("While low intelligence or limited education may cause an appellate court to review the defendant's plea carefully, it does not necessarily preclude a valid plea.  The fact that appellant may have only a seventh grade education does not mean that he was unable to understand the proceedings.  A test for competency to plead guilty is no more stringent than the test for competency to stand trial.") (citations omitted); *Dang v. Commonwealth*, 287 Va. 132, 148, 172 S.E.2d 885,894 (2014) (quoting statement similar to *Bernard*).

[93]  *Dolchok*, 639 P.2d at 914 n.34 (quoting *Schade*, 512 P.2d at 914).

considered incompetent to stand trial to include all such defendants would fundamentally alter the administration of the criminal law. The standard of rational understanding emphasized in *Dusky* must be taken to mean no more than that the defendant be able to confer coherently with counsel and have some appreciation of the significance of the proceeding and his involvement in it.[94]

To the extent that appellant's allegedly low intelligence might combine with other factors to make him incompetent to stand trial, that issue was explored by both the defense expert and the Court's expert at the competency hearing. Testimony that appellant was able to understand concepts only after they were explained to him in simple or graphic language, however, does not have any tendency to make more probable that he was incompetent to stand trial. Such evidence might, in fact, make it more probable that appellant was competent, because it established that he did understand what his attorney told him.[95] The trial court did not err in failing to admit this evidence for the purpose of supporting the conclusion that appellant was incompetent to stand trial.

Moreover, even if the trial court erred in failing to admit this evidence, we do not perceive that appellant's substantial rights were affected so as to constitute harm under the standard for non-

---

[94] *State v. Powers*, 96 Idaho 833, 843, 537 P.2d 1369, 1379 (1975) (quoting Note, *Incompetency to Stand Trial*, 81 HARV. L. REV. 454, 459 (1967)).

[95] There has been no allegation that Schwieger's testimony was relevant as evidence that appellant was *competent*, and so we have no occasion to address whether the trial court would have erred to exclude this evidence had it been offered for such a purpose. *See Pierson v. State*, 426 S.W.3d 763, 770 (Tex. Crim. App. 2014) ("[T]he proponent ordinarily has the burden of establishing the admissibility of the proffered evidence."). *See also* Cathleen C. Herasimchuck*, The Relevancy Revolution In Criminal Law: A Practical Tour through the Texas Rules of Criminal Evidence*, 20 ST. MARY'S L.J. 737, 749 n.32 (1989) ("The proponent of the evidence bears the burden of pointing out the relevancy of the particular testimony."); *Tate v. Robbins & Meyers, Inc.*, 790 F.2d 10, (1st Cir. 1986) ("A party may not claim error on appeal in the exclusion of evidence unless the district court was told not only what the party intended to prove but also for what purpose." Citing 1 Weinstein *Evidence*, § 103[03], at 103-33 (1985 ed.) and McCormick, *Evidence* § 51, at 112 (1972)).

constitutional error.[96] This Court will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, the court has fair assurance that the error did not influence the jury, or influenced the jury only slightly.[97] Although whether appellant was mentally retarded was contested, both experts agreed that appellant was at least a person of low intellect. Evidence that he needed extra help to understand a concept but was ultimately able to do so is not the sort of evidence that would have had more than a slight influence on the jury. Even under the more stringent harm standard for constitutional errors, we are confident beyond a reasonable doubt[98] that the excluded evidence would not have moved the jury from a state of non-persuasion to persuasion regarding the issue of competency.[99] Point of error one is overruled.[100]

### C. Fate of Malingerers

In point of error two, appellant contends that the trial court erred at the competency hearing in excluding evidence "concerning the legal fate of those who obtain an incompetency determination through malingering." Appellant wanted to call Schwieger to testify about procedures at Vernon State Hospital for persons who are discovered to have feigned incompetency. When the prosecutor asked how the evidence was "relevant to whether this individual is competent to stand trial," defense

---

[96] *See* TEX. R. APP. P. 44.2(b)

[97] *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).

[98] *See* TEX. R. APP. P. 44.2(a).

[99] *See Snowden v. State*, 353 S.W.3d 815, 825 (Tex. Crim. App. 2010) (error was harmless under the constitutional standard when error would not have moved jury from a state of non-persuasion to a state of persuasion on any material issue in the case).

[100] Due to our conclusion that the evidence was not relevant on the ground it was offered or that its exclusion, if error, was harmless, we need not address appellant's claim that the trial court was mistaken to exclude the evidence on the basis of the attorney-client privilege.

counsel responded that the evidence would address "the issue that was raised by their witness, Dr. Pittman, which inferred that he was malingering." The prosecutor then objected that Schwieger was not a mental health expert.

Then defense counsel proffered the following testimony:

Q. Stanley, have you had clients that have been or are you aware of clients that have gone to Vernon State Hospital because they were declared incompetent and then learned -- it was later learned at Vernon that they had been malingering?

A. Yes.

Q. And because of that, what happened as a result of their having been discovered?

A. The determination is made by the staff that they are malingering and therefore competent to stand trial.

Q. And then they are sent back here as having been declared competent.

A. They are sent back and declared competent to stand trial.

The prosecutor questioned the relevance of this testimony, saying, "[I]t doesn't mater what has happened in some of his cases. We don't know whether those cases are similar in nature to this case, [or] completely different in nature." The trial court sustained the prosecutor's objection and excluded the evidence.

Appellant cites no authority for the proposition that this type of evidence is admissible. He claims only that it is relevant to rebut the prosecution's claim that appellant was feigning incompetency. But this evidence did not have any tendency to show that appellant was not malingering. Instead, the apparent purpose of this evidence was to encourage a jury to abdicate its responsibility to determine whether appellant was malingering on the ground that experts could later make that determination after appellant has been committed to a mental institution.

In the death penalty context, we have addressed a claim that the jury was entitled to receive information that might make it feel less responsible for the decision it would make. In *Davis v. State*, the defendant claimed that the jury should have been informed of the effect of a failure to agree on an answer to one of the punishment special issues.[101] We held that providing the jury with any information that may be interpreted as relieving it of the responsibility to answer the special issues "is considered an infraction upon the jury's fact finding function."[102] Informing the jury of the effect of its failure to agree would have been "an open invitation for the jury to avoid its responsibility and to disagree."[103] We also saw no relevance in informing the jurors of the result of their failure to agree. We said that, while the information was a correct statement of law, "it concern[ed] a procedural matter and [was] not the proper subject of an instruction by the trial court or comment upon by the litigants."[104]

The present situation is analogous. The evidence appellant sought to admit would have encouraged the jury to delegate its responsibility to determine whether appellant was feigning incompetency because, if he was, the experts would figure it out later. The fact that a malingering defendant would eventually be found out, however, has already been taken into account by the Supreme Court when it determined what burden of proof a state may require the defendant to

---

[101] 782 S.W.2d 211, 221-22 (Tex. Crim. App. 1989).

[102] *Id.*

[103] *Id.* (quoting *Justus v. Commonwealth*, 220 Va. 971, 979, 266 S.E.2d 87, 92 (Va. 1980)).

[104] *Id.* at 222.

shoulder in proving incompetency.[105] We find the reasoning in *Davis* to be applicable here and hold

that it is not appropriate to encourage a jury to avoid its responsibility to determine whether a

defendant is in fact incompetent by informing the jury of the effect of an erroneous incompetency

finding. Point of error two is overruled.

## IV. JURY SELECTION

### A. General Background and Standard of Review

Points of error three through five claim that the trial court erred in denying defense challenges

for cause during jury selection for the capital murder trial. Certain prerequisites for showing harm

must be established before we will consider such claims, but appellant has satisfied those

prerequisites here,[106] so we address whether the trial court erred in denying the challenges.

A prospective juror is challengeable for cause if he has a bias or prejudice against the

defendant or against the law upon which the defense is entitled to rely.[107] To establish a challenge

---

[105] *See Cooper v. Oklahoma*, 517 U.S. 348, 365-67 (1996) (The "modest" effect of a conclusion that the defendant is incompetent when he is in fact malingering (because he will be found out) is why the defendant cannot be required to satisfy a heavier burden of proof of than preponderance of the evidence.).

[106] *See Nava v. State*, 415 S.W.3d 289, 305 (Tex. Crim. App. 2013) ("[T]he defendant must (1) use a peremptory strike against the prospective juror upon whom the challenge for cause had been made, (2) exhaust his peremptory strikes, and (3) request an additional peremptory strike to use upon a specifically identified objectionable prospective juror, who, because the extra strike was denied, actually sits on the jury."). And because appellant asked for and was denied any additional peremptory challenges, he is not required to show more than one meritorious challenge for cause for the purpose of establishing harm. *Cf. Busby v. State*, 253 S.W.3d 661, 673 n.12 (Tex. Crim. App. 2008) ("We note that, assuming the conditions for establishing harm are met, appellant would have to show that the trial court erroneously denied his challenges for cause to two of the three veniremembers (Chang, Hedger, and Mahan), since appellant received an extra peremptory strike.").

[107] Tex. Code Crim. Proc. art. 35.16(a)(9) & (c)(2); *Buntion v. State*, 482 S.W.3d 58, 83-84 (Tex. Crim. App. 2016).

for cause on one of these bases, the proponent must show that the prospective juror understood the requirements of the law and could not overcome his bias or prejudice well enough to follow the law.[108] Before that can be shown, the law must be explained to the prospective juror, and he must be asked whether he can follow the law, regardless of his personal views.[109]

On appeal, we review the trial court's decision to overrule a challenge for cause for abuse of discretion.[110] Due to trial court's ability to observe demeanor and listen to tone of voice, we afford great deference to the trial court's decision, particularly when the prospective juror's answers are vacillating, unclear, or contradictory.[111]

### B. Bias For Death Penalty and Against Life Without Parole

In points of error three and five, appellant complains that venire members Hester and Fore were challengeable for cause because they "had a bias against a life sentence without possibility of parole and a bias in favor of a sentence of death." A juror's views may not be such that he would automatically vote for the death penalty in every case.[112] Instead, a juror must be able to answer the special issues according to the evidence and the law.[113] A juror need not agree with the law as long as the juror's personal views do not substantially interfere with his ability to abide by his oath and

---

[108] *Buntion*, 482 S.W.3d at 84.

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (The federal constitution requires a juror to be excused for cause if he would "automatically vote for the death penalty in every case.").

[113] *Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003).

follow the law.[114]

### 1. *Hester*

In his written jury questionnaire, Hester stated, "No life without parole. I see no reason to keep someone there their entire life." Confronting him with those words, the prosecutor subsequently explored that subject with Hester in jury selection:

Q. But basically what you're telling us today is, "I can listen to the evidence and then decide or make that decision"?

A. I believe I can, yes.

\* \* \*

Q. You had mentioned in your questionnaire that life without parole is never sufficient, but after explaining these questions [the special issues] to you and going over the process, you're saying that you can reserve judgment on anything until you hear all of the evidence?

A. Yeah, I think so. I – my personal opinion being what it is, I still think that the way the Court lays it out that I have to follow exactly what is there, not that I necessarily like it, but I have to follow and answer the questions.

Q. And you could follow the law –

A. Yes, I believe I can.

Q. – and the Court's instructions.

A. Yes.

Q. And you're not leaning one way or another; you can be neutral until you hear all the evidence.

A. I believe I can, yes.

THE COURT: Mr. Hester, if you thought the evidence justified a sentence of life without parole, could you assess a sentence of life without parole?

---

[114] *Id.*

A. I believe I can. It would go against my grain, but I believe I could, because that's what the law requires.

* * *

Q. And in the event that we didn't carry our burden of proof or you didn't feel that he was a future danger, that you could answer the question no and give him a sentence of life without parole?

A. Yes.

* * *

Q. And if you felt like he, you know, wasn't a party to any incident, that you could answer the question no. Is that correct?

A. Yes.

* * *

Q. And if you felt that they [the defense] did meet their burden of proof [on the mental retardation issue], you could answer that question yes, knowing that he would get a life without parole sentence.

A. Yes.

* * *

Q. And then on the last question, the mitigation question, that if you felt – whether taking into consideration all of the evidence and all of the stuff that we talked about on Question Number 4, if you felt that the answer to that question was yes, there was sufficient mitigating circumstances or there was sufficient mitigating circumstance, that you could answer the question yes, knowing that it would be life without parole?

A. Yes.

Defense counsel also explored the subject with Hester:

Q. And if the truth is, "Well, I know me, and I know that my bias is, if somebody has done that, they ought to die and I ought not to have to pay for them as a taxpayer, if that's how you feel, this is the time now that we need to know that.

A. Okay. The honest truth is, yes, that's the way I feel. Now, whether that's the way

– I mean, I still believe – and I'm not going to – you know that I have time constraint problems –

Q. Sure.

A. – and you know that this is not fun, and you know that most people don't want to be on one of these juries.

Q. Right?

A. So I'm fixing to say something that I really believe, even though I don't want to say it. While life on parole, I don't necessarily agree with it, if I'm presented with a question, if I'm presented with the evidence, I believe I have a moral obligation to do it right.

\* \* \*

A. But if I was to be on the jury, I have a moral obligation to this country, to the people of this country, and to my God, to answer the questions as I see the answer.

\* \* \*

Q. [Y]ou were asked – the question was, "Do you think life in prison without the possibility of parole can ever be a sufficient punishment for somebody who, without justification, kills another person," and you put, "No," and you said, "I see no reason to keep a person there their entire life."

A. I disagree with life without parole. I just do.

Q. Okay.

A. That doesn't mean that I have a choice when it comes down to it.

Q. Well, actually it does mean that, and the reason I say that is that if a person believes that they are biased toward a death sentence, they ought not to serve on a jury. Does that make sense?

A. That's – that makes sense. I mean, that's fine. That's your opinion. I mean, like I said earlier, if I wanted out, that would have been my perfect out.

Q. Sure.

A. Unfortunately, I'm not sitting here saying that.

Q. Okay. What I hear you saying, then, is, "If I'm on the jury, in spite of the fact that I might feel like that, I'm going to answer the questions the way the law requires.

[PROSECUTOR]: Your Honor, that's not what he said.

A. I'm going to try.

THE COURT: I believe this man has said that he's going to follow the law and answer the questions the way the evidence leads him.

In challenging Hester for cause, defense counsel stated, "I realize he didn't – he answered the questions saying that he could follow the law and that he would set everything aside, but it was clear and obvious throughout his questioning that – he said repeatedly that he has got a bias, that he has got a leaning towards the death penalty." Later, defense counsel stated, "I understand that he said he could follow the law, but I think it's pretty clear that he may think that, but he's going to have an awfully hard time doing that."

The trial court did not abuse its discretion in denying the challenge for cause. Even defense counsel recognized that Hester said that he could follow the law, and the trial court was well within its discretion to believe Hester in that regard. Although Hester clearly stated that he disagreed with giving life without parole, he also stated that he would answer the special issues according to the law and the evidence even if that meant giving life without parole. Any vacillation in Hester's answers was within the trial court's discretion to resolve. Point of error three is overruled.

### 2. *Fore*

On his written jury questionnaire, Fore also indicated that he did not agree with the punishment of life without parole, saying that he was "[n]ot a fan of it," and, "No, they should pay the same price." When asked about these statements during jury selection, Fore responded that, for people for whom the death penalty is an option, he did not want to have to pay, as a taxpayer, "for

them to live out the rest of their lives." However, when asked whether he would automatically

impose the death penalty, Fore said, "No, I'm not automatically going to. I'm just not a fan of it."

With respect to each of the special issues, Fore agreed that he would require the State to prove its

case and not automatically answer in the State's favor:

> Q. And you're going to require us to prove that he's going to be a future danger. You're not going to automatically say "death"?
>
> A. Correct.
>
> Q. You're not going to automatically say yes to that answer of Question 2. Right? You're still going to require the State to prove its case beyond a reasonable doubt. Right?
>
> A. Yes, yes.
>
> Q. And you're still going to keep an open mind to all those questions. Even while you may not be the fan of life without parole, you could still hold yourself and hold the State to its burdens, won't you?
>
> A. Yes.
>
> Q. Okay. And when we get down to the final question dealing with mitigation, you're not going to rubber stamp that "death," are you?
>
> A. No.
>
> Q. And if you saw something sufficiently mitigating in your mind that it warranted a sentence of life without parole, you could do that and answer yes, couldn't you?
>
> A. Yes.
>
> Q. Keep an open mind –
>
> A. Sure.
>
> Q. – throughout the entirety of the trial?
>
> A. Absolutely.

\* \* \*

Q. But what you've told me today is you would still keep an open mind to the full range of punishment throughout the entirety of the trial. Is that right?

A. Yes.

Q. You would require the State to prove to you that somebody is going to be a future danger before answering that question?

A. Right. I answered this [the questionnaire] without knowing all of that.

\* \* \*

Q. So do you agree with the law, now that we've talked about it?

A. Sure, I do. I would follow the law, absolutely.

Defense counsel later explored Fore's answers to the questionnaire:

Q. And my question is: Because, you know, you think generally that life without parole is not sufficient, are you going to either not put that burden on them or put some kind of burden on us to prove to you that that answer should be no so that he gets a life without parole sentence?

A. Well, if he has got me on the death penalty, it's going to be your burden to get me off of it, I would guess.

Q. Okay.

A. Does that make sense?

Q. I don't know. Explain that a little bit more.

A. Well, if he has convinced me that we've met the criteria for the death penalty, I think at that point it's yours to convince me that we haven't. I don't know if I'm saying that right or saying that wrong or if that's even part of the process.

Q. So I guess like that first part, how would you look at that first question as to whose burden it should be?

A. Well, I believe it's his burden to get me to the death penalty.

Q. Okay.

A. But if he has gotten me there, I'm going to stay there unless somebody else gets me off of it.

Q. Okay. So you're saying if they meet their burden of proof. You're not putting the burden of proof on us to prove to you that the answer should be no?

A. Right.

* * *

Q. [B]ut that last question [mitigation], you've already found that a person is going to be a future danger, you've already found that they either caused the death or they anticipated that the death would occur, you've already found that they are not mentally retarded, and that's kind of your last look at the evidence. And you feel like you could look at that evidence, you could take a fresh look at the evidence, or would your mind already be made up that there is just no way a life without parole sentence could ever be appropriate in a case like that?

A. I don't want to say "ever," but it seems to me that at that point it would be the most appropriate.[115]

Among defense counsel's for-cause challenges to venire member Fore was the contention that Fore had a "preference" and "strong leanings" regarding life without parole and had answered on his jury questionnaire that life without parole was never an appropriate punishment and that he was not a fan of life without parole.

The trial court did not abuse its discretion in denying the challenge for cause. Although Fore's questionnaire indicated that life without parole would never be an appropriate punishment, once the law about the special issues was explained to him, he said that he agreed with the law and would follow it and that he answered the questionnaire "without knowing all of that." And any vacillation by Fore was within the trial court's discretion to resolve. Point of error five is overruled.

---

[115] "Most appropriate" may be a reference to the mental retardation issue. During his questioning, Fore expressed some sympathy for individuals with mental retardation and related that his mother was a special ed teacher.

### B. Bias for Law-Enforcement Witnesses

In point of error four, appellant complains that Hester was also challengeable for cause because he believed law enforcement officers to be more credible than other witnesses. A prospective juror "who cannot impartially judge the credibility of witnesses is challengeable for cause for having a bias or prejudice in favor of or against a defendant."[116] Impartiality with respect to the credibility of witnesses does not, however, mean that a juror must have no views on what characteristics make a witness more or less credible. Rather, it means that the person is genuinely open-minded and subject to persuasion, "with no extreme or absolute positions regarding the credibility of any witness."[117] Being more or less skeptical of a certain category of witness does not make a prospective juror challengeable for cause.[118]

When asked about whether police officers are more believable than other people, less believable, or the same, Hester responded, "I believe they are more believable. I really do. I believe that – besides having a brother that is a police officer, I've ridden with him, I've been with other police officers. As a general rule, I believe that profession is up front and as good as they can be." When asked whether police officers "are going to be more believable than other people, just a person off the street who has no training like that," Hester further responded, "As far as answering questions as to their expertise, yes, I believe that they will be more believable. As far as general questions, personalities, that kind of thing, they have no training that way, they have no – I have no reason to believe that they are any better at it than anybody else."

---

[116] *Feldman v. State*, 71 S.W.3d 738, 745 (Tex. Crim. App. 2002).

[117] *Id.* at 747; *Jones v. State*, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998).

[118] *Feldman*, 71 S.W.3d at 747; *Jones*, 982 S.W.2d at 389.

The trial court did not abuse its discretion in denying the challenge for cause. Hester expressed the view that police officers were more believable than other witnesses when it came to matters within their expertise, but even as to those matters, Hester did not express any extreme or absolute positions regarding police officers' credibility. Point of error four is overruled.

## V. EVIDENCE

### A. Extraneous Offense

In points of error seven and eight, appellant contends that the trial court erred in admitting evidence of an extraneous offense at the guilt stage of trial. Specifically, appellant complains about the admission of evidence that he told Miller and Kerrie that he was going to Waco to buy drugs and would give each of them drugs for going with him.

### 1. *Background*

In opening statement, defense counsel described Miller as "high and hungry" and "angry" shortly before the murder, and he described Kerrie as someone who "looked up to" Miller. Before Miller testified, the State indicated that it wished to elicit testimony from Miller that appellant had supplied him with cocaine in the past and told him that he (appellant) was going to Waco to buy cocaine and would give Miller some if he came with him. The State referred to defense counsel's discussion of Miller in his opening statement as justification for admitting the evidence. The trial court excluded evidence that appellant had supplied Miller with cocaine in the past but, after "balancing the probative value and the prejudicial effect," ruled that appellant's statements to Miller on the day of the murder were admissible. Appellant requested and obtained a running objection. We have already discussed the evidence in question in connection with appellant's challenge to the

sufficiency of the evidence to support his conviction.[119]

## 2. *Analysis*

To the extent that appellant challenges the admission of any statements by appellant promising to give *Kerrie* drugs, he has failed to preserve error. Appellant does not point to any place in the record in which he objected to such evidence.[120] We will assume, without deciding, that appellant's running objection was broad enough to cover both Miller and Kerrie's testimony about appellant promising to give *Miller* drugs.[121]

At the time of trial, Rule 404(b), which addressed the admissibility of "evidence of other crimes, wrongs, or acts," provided in relevant part:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . . [122]

Appellant's brief does not explain exactly what aspect of the testimony it is that he is alleging was a bad act. It is not his statement about buying drugs or giving Miller drugs. Statements about those anticipated acts are mere inchoate thoughts that are not excludable under Rule 404(b).[123] We will assume that appellant's promise to give drugs, or a false promise to give drugs, rises to the level of

---

[119] *See supra* at part I.B.

[120] *See* TEX. R. APP. P. 33.1.

[121] *See Lopez v. State*, 253 S.W.3d 680, 684 (Hearing outside presence of jury does not necessarily end the inquiry into whether error was preserved "because we must still address the scope of the trial judge's ruling.").

[122] TEX. R. EVID. 404(b) (West 2014).

[123] *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993).

a "bad act" that could fall under Rule 404(b)'s prohibition.

Even so, the evidence appears to be relevant to a nonconformity purpose, to show appellant's intent in connection with the underlying offenses of burglary and retaliation and to show his plan to murder his wife and cast the blame onto Miller. This evidence was directly relevant to the "plan" purpose of Rule 404(b) because appellant's promise of drugs to Miller was one of the steps taken in preparation for the murder.[124] Moreover, the evidence also rebutted defense counsel's insinuation in opening statement that Miller murdered Kimberly while "high" and "angry" by showing that Miller was just a pawn in appellant's plan.[125]

Because the trial court conducted a prejudice-versus-probative-value balancing analysis, we will assume that appellant also preserved a Rule 403 complaint and address it here. At the time of appellant's trial, Rule 403 provided that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[126] Rule 403 favors the admission of relevant evidence.[127] "Unfair prejudice" under the rule refers to "a tendency to suggest decision on an improper basis, commonly, though not necessarily, an

---

[124] *Daggett v. State*, 187 S.W.3d 444, 451 (Tex. Crim. App. 2005) ("When used properly, the 'plan' exception allows admission of evidence to show steps taken by the defendant in preparation for the charged offense.").

[125] *See Dabney v. State*, 492 S.W.3d 309, 317 (Tex. Crim. App. 2016) ("[A] defense opening statement could open the door to the admission of extraneous-offense evidence to rebut the defensive theory presented in the opening statement.").

[126] TEX. R. EVID. 403 (West 2014).

[127] *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

emotional one."[128] Evidence is excludable under Rule 403 only when there is a clear disparity between the degree of prejudice and the probative value of the evidence.[129] A proper Rule 403 analysis includes, but is not limited to, the following factors: (1) the probative value of the evidence, (2) the potential to impress the jury in some irrational, yet indelible way, (3) the time needed to develop the evidence, and (4) the proponent's need for the evidence.[130]

Here, the probative value of the evidence was strong. Appellant's promise of drugs to Miller was one of the steps in his plan to commit the murder, evidence of that promise helped substantiate the offense of retaliation, and the evidence helped to rebut appellant's defensive theory that Miller committed the murder. Although the evidence had some tendency to show that appellant was a drug dealer—a character conformity inference Rule 404(b) seeks to avoid—the State needed this evidence to show the full context of the murder, and it was important evidence that appellant planned the murder all along—substantiating the underlying offense of retaliation. Finally, only a short time was needed to develop this evidence. We conclude that the trial court did not abuse its discretion in concluding that the danger of unfair prejudice from the admission of the evidence did not substantially outweigh the evidence's probative value. Points of error seven and eight are overruled.

### B. Testimony by Witness Previously Represented by Counsel

In point of error nine, appellant contends that the trial court abused its discretion "by admitting evidence which undermined defense counsel before the jury and created a conflict of interest which denied Petetan his right to the effective assistance of counsel." This complaint refers

---

[128] *Id.*

[129] *Id.*

[130] *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005).

to the trial court's decision to allow Mubarak Ali to testify at the punishment stage of trial. Appellant claims that allowing Ali to testify created a conflict of interest because one of appellant's attorneys had previously represented Ali. He claims that this caused him to be denied his constitutional right to the effective assistance of counsel.

## 1. *Background*

Defense counsel Hunt had previously represented Ali for a period of three to four weeks in a synthetic marijuana case. However, Hunt ultimately returned Ali's retainer and was not representing Ali at the time of appellant's trial. Although Ali had not been indicted, his case was pending. Prosecutors in appellant's case first became aware that Ali had relevant information on the last day of jury selection. The defense took the position that allowing Ali to testify would create a conflict of interest due to Hunt's prior representation, so the defense requested that "he be excluded as a witness and not allowed to testify."

When asked by the trial court how this was a conflict, one of the other defense attorneys claimed that "Hunt would have gained information that now he can no longer use or he will be precluded from using . . . he can't divulge it to me, so he can't use it for Mr. Petetan . . . . [A]nything he learned during his course of representation . . . that still would be something that he cannot divulge or disclose in any manner even though he's no longer representing him." When asked whether he learned anything from Ali about appellant's case, Hunt replied, "I learned some facts about Petetan from him, yes, sir."

In a hearing outside the presence of the jury, Ali testified to the following: He asked appellant who his attorney was and appellant answered, "Russell Hunt is my attorney. He's a good attorney." Ali contacted Hunt that day and was told to see him when Ali got out of jail. The next

day, Ali told appellant what Hunt had said, and appellant repeated that Hunt was a good attorney and that appellant had a murder case. Ali asked, "Who," and appellant said it was his wife. Appellant further said that Hunt advised him to act like he was "mentally sick," and not to use the phone, "so by the law they are not going to give you the death penalty." When Ali first went to see Hunt, Hunt asked how Ali knew about him. Ali replied, "Big Boy. You got murder case. You have it. He told me everything. That's why I come to see you."[131] Ali further stated that appellant "told me you are a good lawyer and you charge him that much money. That's why I come to see you." Ali testified that he made no other statements to Hunt about appellant.

The defense contended that Hunt would deny that he told appellant to act mentally sick, and therefore, "[N]ow Mr. Hunt is a potential witness in this case." The trial court and the State pointed out that Ali's testimony was only what *appellant* said, and the question was whether appellant said it, not whether Hunt actually advised appellant in that way. Hunt also stated that he would contradict Ali's testimony because Ali "didn't know that Mr. Petetan was charged with murder. He made the remark to me that he's charged with drugs, and I'm the one that told him that he was charged with murder. I told him, 'He's charged with murdering his wife.'"

The defense also complained that Ali's testimony would make it look like the defense was fabricating the mental retardation claim and the evidence presented. The trial court responded, "I want to make it clear that – I do not believe Mr. Hunt has violated any canons or rules or anything else. I know him too well to know that – to believe that. But that's not really the issue here." One of the prosecutors suggested, "We could limit his [Ali's] testimony so that he doesn't say who told him to act crazy." The prosecutor emphasized that the State was not offering the testimony to show

---

[131] "Big Boy" was a nickname appellant had while incarcerated.

that the attorneys told appellant to act crazy or mentally sick, and "[a]s a matter of fact, I don't believe it's true."

The trial court ruled that Ali could testify, but he could not say who appellant said told him to act mentally sick, and he could not talk about Hunt's representation of him. When Hunt also expressed concern about Ali testifying about being aware that appellant was charged with murder, one of the prosecutors responded, "[I]f you'll give us some time this morning, then I'm confident we can come back to you and we can proffer precisely what this man is going to testify to, to satisfy you." The trial court responded, "All right. Let's do that."

Ali subsequently testified in front of the jury as we have set out in our discussion of appellant's sufficiency challenge on the issue of mental retardation.[132] Although Ali testified to appellant saying that he was acting mentally sick to avoid the death penalty, no mention was made of anyone telling appellant to act mentally sick. And although Ali made a general statement that he talked with appellant about his case, Ali did not say that he was told or knew that appellant was charged with murder. Ali did not mention Hunt on direct examination but did mention him on cross-examination in a nonresponsive answer to a question:

> Q. And when was it that you went to the District Attorney's office or to anybody with this information?
>
> A. The first time I go to – I go to my lawyer office, and he asked me about, "How you know Mr. Russell Hunt," so I told him, "Big Boy."

At this point the trial court interrupted Ali's answer, held an off-the-record-bench conference, and

---

[132] *See supra* at part II.B.11.

afterwards directed Ali to give a responsive answer to defense counsel's question.[133]  The defense

cross-examination of Ali was conducted by an attorney on the defense team other than Hunt.

## 2. *Analysis*

A denial of a defendant's right to effective assistance of counsel may result from an

attorney's conflict of interest.[134]  How a conflict of interest claim is analyzed depends on whether

the defendant or his attorney objected at trial.[135]  When a potential conflict is brought to the attention

of the trial court, the trial court has an obligation to investigate and determine "whether the risk of

the conflict of interest is too remote to warrant separate counsel."[136]  When the conflict is not brought

to the trial court's attention, but is raised later on appeal, the defendant must show that his attorney

was operating under an actual conflict that adversely affected his performance.[137]

Here, the defense team claimed to the trial court that there was a potential conflict arising

from Ali's testimony.  The trial court conducted an investigation by having the parties question Ali

outside the presence of the jury, by eliciting information from Hunt, and by hearing the arguments

of the parties.  With the urging and approval of the trial court, the prosecutors acted to eliminate the

defense's concerns by placing limits on Ali's testimony.  Appellant nevertheless contends that

defense attorney Hunt had two conflicts: (1) between his representation of appellant and his

---

[133]  The defense team did not lodge on the record any request for relief as a result of Ali's non-responsive answer.

[134]  *Routier v. State*, 112 S.W.3d 554, 581 (Tex. Crim. App. 2003).

[135]  *Id.*

[136]  *Id. (citing Holloway v. Arkansas*, 435 U.S. 475, 484 (1978)).

[137]  *Id.* (citing *Cuyler v. Sullivan*, 466 U.S. 335, 348 (1980)).

representation of Ali, and (2) between his own interests and appellant's interests.

Appellant contends that Hunt had a conflict due to his representation of appellant and Ali because Hunt "was precluded from cross-examining Ali with confidential information he acquired while representing Ali." To the extent appellant's position is based on information Hunt could not reveal to anyone, including the rest of the defense team, because it was privileged,[138] we fail to see how the defense team was adversely affected. Hunt did not cross-examine Ali; another member of the defense team—uninfluenced by the privileged information Hunt possessed—performed that task. And if Hunt were barred by privilege from informing other members of the defense team, he would be barred from revealing the information regardless of whether he was one of the attorneys on appellant's case.

To the extent appellant may be referring to Hunt's statement about Ali believing that appellant was charged with a drug offense rather than with murder, we observe that Ali did not testify in front of the jury about any of his interactions with Hunt, and Ali did not testify to being told or knowing that appellant was charged with murder. Perhaps a jury could infer that Ali knew appellant was charged with murder because Ali testified that appellant said he was acting mentally sick *to avoid the death penalty*. But even if Hunt's information were disclosable to impeach Ali's testimony, the proper remedy would not be to exclude Ali's relevant, non-privileged testimony, but to attempt to impeach him with Hunt's information, and deal with the consequences to Hunt remaining an attorney on the case if the impeachment were allowed.[139] The least intrusive step might

---

[138] *See* TEX. R. EVID. 503(b).

[139] *See* TEX. DISC. R. PROF. CONDUCT 3.08. *Cf. Flores v. State*, 155 S.W.3d 144, 147-51 (Tex. Crim. App. 2004) (imposing "compelling need" test when *opposing party* seeks to call a party's lawyer as a witness); *Brown v. State*, 921 S.W.2d 227, 230-32 (Tex. Crim. App. 1996)

have been to cross-examine Ali about whether he told someone, after Ali's alleged conversation with appellant, that he thought appellant was charged with a drug offense. If Ali would not admit to that statement, then the trial court might have to address whether Hunt could testify, and if so, whether he could remain as an attorney on the case.

But these steps were not taken, and while the defense team expressed concerns about the testimony given by Ali outside the presence of the jury, no explanation appears in the record for the defense team's failure to attempt to use Hunt's information to impeach the testimony given by Ali in the jury's presence. As a result, the record is insufficient to show that the failure of the defense to impeach Ali was due to a conflict created by Hunt remaining on the case. With Ali's testimony being limited and references to Hunt suppressed, the defense team may have had strategic reasons, aside from Hunt's remaining on the case, for declining to attempt to impeach Ali with what was at best, indirect evidence that Ali might not be telling the truth.[140]

---

(Keller, J., concurring) (discussing due process implications of the prosecutor being a witness in the case). *See also Pearson v. Parsons*, 541 So. 2d 447, 452 (Miss. 1989) (The rule against advocate-witnesses "is not an immunity from testifying by the advocate witness, but it is a limitation on advocacy.").

[140] *See Alberni v. McDaniel*, 458 F.3d 860, 872-73 (9th Cir. 2006) ("The present record is insufficient to determine whether an actual conflict of interest existed. Mr. Buchanan [defense attorney] failed to impeach Mr. Flamm [former client] with his prior conviction, his probation status, and on multiple points of his testimony. These omissions appear to be critical in light of the impact they could have on the jury's perception of Mr. Alberni's credibility and his propensity for violence. Mr. Flamm was called as a rebuttal witness to impeach Mr. Alberni. When the only evidence supporting Mr. Alberni's claim that the shooting was accidental was his own testimony, it was critical that the jury find him credible. However, the failure to question Mr. Flamm regarding his prior conviction, his probation status, and his inconsistent testimony is not necessarily attributable to a conflict. A link between deficient performance and the conflict of interest must be shown. The district court did not conduct an evidentiary hearing. Thus, Mr. Buchanan has not been interrogated concerning his failure to impeach Mr. Flamm regarding his criminal record and his inconsistent testimony. Although Mr. Buchanan's testimony on this matter would not be conclusive, there may be legitimate tactical reasons for Mr. Buchanan's decision not to impeach Mr. Flamm on these

Appellant contends that there was a conflict between appellant's interests and Hunt's own interests because the "jury was left with the clear impression that someone, probably counsel, had coached Petetan on feigning mental illness in an effort to avoid the death penalty" and that "Hunt [was] in the untenable position of attempting to save Petetan's life with an intellectual disability defense while at the same time defending himself from implications he was sponsoring false testimony." We disagree. Nothing in Ali's testimony before the jury indicates that anyone coached appellant to feign mental illness or mental retardation. The jury could easily have believed that such feigning was entirely appellant's idea. Even if the jury thought that someone might have suggested the idea to appellant, it would have no reason from Ali's testimony to think that the defense attorneys did so. Although Ali briefly mentioned Hunt in cross-examination, his testimony was cut off, he was told to respond to the question that was asked, and the jury was given no indication that the mention of Hunt had any relevance to any issue in the case. The trial court did not err in its ruling on appellant's conflict-of-interest claims and in allowing Ali to testify. Point of error nine is overruled.

## VI. PUNISHMENT CONSTITUTIONAL CHALLENGES

### A. Jury Unanimity

In a supplemental point of error, appellant contends that the jury charge violated his state constitutional right to a unanimous verdict because the jury was not required to agree on the underlying offense that elevated the murder to capital murder. The jury charge at guilt said:

---

matters. We will not speculate about his cross-examination strategy. However, without Mr. Buchanan's testimony, we cannot reach a satisfactory resolution of the question whether Mr. Buchanan's prior representation of Mr. Flamm adversely affected his defense of Mr. Alberni.") (citations omitted).

> It is not necessary that all of you agree on whether the Murder, if any, occurred during the course of committing or attempting to commit, burglary, or kidnapping or retaliation. But in order to find the Defendant guilty of Capital Murder all of you must agree beyond a reasonable doubt that the Defendant intentionally committed the Murder of Kimberly Petetan and that he did it during the commission or attempted commission of one or more of the other felony offenses charged in the indictment.

Appellant relies upon *Ngo v. State*[141] for his contention that the jury charge violated his constitutional right to a unanimous verdict.

A jury need not be unanimous about the underlying offense that elevates murder to capital murder.[142] We have reaffirmed this rule after *Ngo*, saying that "[t]he jury charge may disjunctively allege 'all alternate theories of capital murder contained within § 19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder.'"[143] What statutory elements a jury must be unanimous about depends upon the focus of the offense as dictated by the statute defining the offense,[144] and given the wide difference between the capital murder offense at issue here and the credit card offense at issue in *Ngo*, *Ngo* is simply inapplicable.[145] Appellant's supplemental point of error is overruled.

### B. Request for Pretrial Determination of Mental Retardation

---

[141] 175 S.W.3d 744 (Tex. Crim. App. 2005) (credit card fraud).

[142] *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991).

[143] *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) (quoting *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009)).

[144] *Young v. State*, 341 S.W.3d 417, 423-24 (Tex. Crim. App. 2011); *Huffman v. State*, 267 S.W.3d 902, 906-07 (Tex. Crim. App. 2008).

[145] *See Huffman*, 267 S.W.3d at 905-06 (discussing capital murder as a homicide offense analyzed under *Kitchens* and contrasting the credit card abuse offense in *Ngo* with homicide and injury-to-a-child offenses).

In point of error twenty-seven, appellant contends that he was "denied equal protection of the law due to the absence of a unified statutory procedure for pretrial litigation of an *Atkins* assertion of intellectual disability." Appellant cites our recent mandamus decision of *In re Allen*[146] to show that we allowed a court in Dallas County to conduct a pretrial determination of whether a capital murder defendant is exempt from the death penalty due to mental retardation. Appellant contends that he has been subjected to disparate treatment and should not have been denied a pretrial determination simply because he was prosecuted in McLennan County instead of Dallas County.

In *Allen*, this Court held that the law was unclear regarding whether the issue of mental retardation could be decided before trial.[147] In responding to the dissenting opinions, this Court carefully explained that the holding was based on the posture of the case on mandamus and was not a statement approving the pretrial resolution of the mental retardation issue:

> If the law surrounding a court's action is unclear, mandamus relief may not issue despite how unwise we think the action may have been. At times, it is an exercise akin to judicial restraint. The dissenters understand this opinion to modify the Legislature's procedural scheme in death-penalty cases or that this Court judicially approves of deciding the intellectual-disability issue pretrial. These conclusions stem from a misreading of this opinion, and they lose sight of the case's procedural posture. This case, like all mandamus cases, must be decided on the existing law alone. Unfortunately, we find none that supports a conclusion that granting Allen's request for a pretrial intellectual-disability determination deviated so far from well-settled legal principles to be considered acting outside a judge's authority. Even if we were inclined to again act when the Legislature has not, a mandamus proceeding is not the appropriate place to interpret statutory language, clarify this Court's precedent, or create law where there is none. We hold that the absence of existing law precluded granting the State's mandamus relief below; it is by no means an endorsement of the judge's action.[148]

---

[146] 462 S.W.3d 47 (Tex. Crim. App. 2015).

[147] *Id.* at 52-53.

[148] *Id.*

The present case is not a mandamus proceeding.  It is a direct appeal in which "new law" can be made.  We shall, therefore, address the issue of whether a pretrial determination will be required upon request or prohibited altogether.[149]  We conclude, based on the reasoning of the dissenting opinions in *Allen*[150] and Judge Yeary's concurrence,[151] and on the reasoning in *Woods v. State*,[152] that a pretrial determination of the issue of mental retardation should not be allowed.   At any pretrial determination of mental retardation, the State would have to marshal "all of its evidence" of the defendant's guilt of the offense and his role in the offense in order for the factfinder to be able to assess how that evidence might weigh into resolving the issue.[153]  That has to occur because the defendant's conduct in connection with the offense is relevant to determining whether he is mentally

---

[149] *See id.* at 54 (The "continued absence" of a scheme regarding the determination of mental retardation "portends serious consequences for our criminal-justice system.  Without a unified procedure, intellectual disability determinations may vary from county to county, court to court, and case to case."); *Briseno*, 135 S.W.3d at 4-5 (deciding that this Court had to act "during this legislative interregnum" to provide guidelines to the bench and bar); *Allen*, 462 S.W.3d at 67 (Newell, J., dissenting) ("[T]his Court has repeatedly left the door open for the legislature to act" regarding the procedures for determining mental retardation.).  *Cf. Williams v. State*, 273 S.W.3d 200, 214-25 (Tex. Crim. App. 2008) (deciding the issue of whether a defendant had the right to insist on a waiver of the mitigation special issue in a death penalty case and concluding that he did).

[150] *See Allen*, 462 S.W.3d at 59-66 (Alcala, J., dissenting); *id.* at 66-68 (Newell, J., dissenting).

[151] *See id.* at 54-59 (Yeary, J., concurring).

[152] 153 S.W.3d 413 (Tex. Crim. App. 2005).

[153] *Allen*, 462 S.W.3d at 63 (Alcala, J., dissenting).  Judge Yeary expressed similar sentiments, stating that any pretrial hearing on the issue of mental retardation would "likely include, in addition to any other evidence reflecting directly upon the criteria for establishing mental retardation, a trial of the very facts of the capital murder offense itself."  *Id.* at 58 (Yeary, J., concurring).

retarded.[154]  Moreover, nearly all of the State's punishment evidence would be relevant as well.  For example, extraneous offenses not explored at the guilt phase could shed as much light on a defendant's mental abilities as the offense for which he is on trial.  Mental retardation "is a sentencing issue," and litigating such an issue before a finding of guilt "puts the cart before the horse and results in an advisory opinion."[155]

In concluding that the issue of mental retardation should not be resolved pretrial, Judge Newell found persuasive our prior decision in *State ex rel. Watkins v. Creuzot*,[156] in which we held that a defendant was not entitled to a pretrial hearing to determine whether a lengthy delay in obtaining post-conviction relief had rendered mitigation evidence unavailable for a death penalty retrial.[157]  Judge Newell found especially persuasive one passage in the opinion that explained that the alleged constitutional injury was contingent upon future events and therefore not ripe for decision pretrial:

> The issue of the adequacy of Reed's mitigation case  is not "fit" for judicial decision before it is presented.  Here, a capital-murder defendant is seeking a pretrial declaratory judgment that any mitigation case that he might mount would necessarily be inadequate and therefore any prospective death sentence would, if it occurred, violate the Eighth Amendment, the Sixth Amendment, and the Due Process Clause.  "These assumptions are simply not warranted before a jury has considered the

---

[154] *See supra* at part II.A.; *Neal v. State*, 256 S.W.3d 264, 272 (Tex. Crim. App. 2008) ("Indeed, we have noted that the nature of the offense itself may be relevant to a determination of mental retardation.").

[155] *Allen*, 462 S.W.3d at 68 (Newell, J., dissenting).

[156] 352 S.W.3d 493 (Tex. Crim. App. 2011).

[157] *Allen*, 462 S.W.3d at 67-68 (Newell, J., dissenting).

evidence in the present case and rendered a verdict."[158]

We agree with Judge Newell that the litigation of the issue of mental retardation before trial is an inquiry that would be contingent on future events, like the inquiry the defendant attempted in *Creuzot*, and that such an inquiry would be premature.

This view is consistent with our holding in *Woods v. State* that the sufficiency of the evidence to support an element of the offense of evading detention cannot be litigated at a pretrial suppression hearing.[159] We explained that "statutes authorizing pre-trial proceedings do not contemplate a 'mini-trial' on the sufficiency of the evidence to support an element of the offense."[160] "The purpose of a pre-trial motion is to address preliminary matters, not the merits of the case itself."[161] As with the issue of guilt, sentencing issues involve "the merits of the case itself." We conclude that the sentencing issue of mental retardation may not be litigated before trial.[162]

---

[158] *Id.* (quoting *Creuzot*, 352 S.W.3d at 505-06 (quoting *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 916 (Tex. Crim. App. 2011))).

[159] 153 S.W.3d at 415.

[160] *Id.*

[161] *Id.*

[162] In his concurrence in *Allen*, Judge Meyers contended that, while the issue of mental retardation "is a punishment issue, it is no different than conducting a pretrial determination of whether the defendant was a juvenile at the time of the offense." 462 S.W.3d at 54. But any person under seventeen years of age must be transferred from the juvenile system before he can be tried as an adult for a felony offense such as capital murder. *Moon v. State*, 451 S.W.3d 28, 37-38 (Tex. Crim. App. 2014). We are aware of no authority that condones a pretrial determination of age aside from juvenile proceedings, but even if there were such authority, the issue of a defendant's age is distinct from the issue of mental retardation in two relevant respects. First, the defendant's age at the time he committed a homicide would, except in the most unusual case, be readily ascertainable and not subject to reasonable dispute. Second, how old a defendant is does not depend on the facts of the offense or other evidence relating to the defendant's dangerousness and moral culpability, so the parties would not have to litigate their guilt and punishment cases in a pretrial proceeding.

Having now concluded that the issue of mental retardation may not be litigated pretrial, we further conclude that appellant is not being treated differently under the law in violation of his right to equal protection. Any pretrial determination that a prior defendant may have received while the law was uncertain (if that occurred) would be a chance windfall and would not be sufficient to show an equal protection violation.[163] Moreover, we fail to see how appellant was harmed by any alleged inequity.[164] Appellant ultimately received full consideration of the issue of mental retardation by a finder of fact under the evidence that the parties would have been permitted to present at a pretrial hearing if one were allowed and had been held. Point of error twenty-eight is overruled.

### C. Other Punishment Challenges

In points of error twelve through twenty-six, appellant raises various constitutional challenges to the Texas death-penalty scheme. He contends that the trial court erred in the following respects: by failing to define the terms "militate," "probability," "criminal acts of violence," "continuing threat to society," "personal moral culpability," and "moral blameworthiness" in the jury charge; by overruling his objection to the instruction that ten votes were required to return a "no" answer to the future dangerousness special issue and refusing to instruct the jury that a life sentence would be imposed if it could not agree on its answer to one of the special issues; by overruling his objection to an "anti-sympathy" instruction; by overruling his request that the jury be instructed on the concept

---

[163] *See Taylor v. State*, 10 S.W.3d 673, 678 (Tex. Crim. App. 2000) (explaining the Supreme Court's view in *Stovall v. Denno*, 388 U.S. 293, 297 (1967), that, although "some 'inequity arguably results from according the benefit of a new rule to the parties of the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue,' the Court regarded 'the fact that the parties involved are chance beneficiaries as an insignificant cost for the adherence to sound principles of decision-making'").

[164] *See* TEX. R. APP. P. 44.2(a) (harm standard for constitutional errors).

of mercy and the role it can play in deliberations; by submitting the issue of future dangerousness when it was not found by the grand jury or alleged in the indictment; by failing to submit four requested instructions regarding the jury's consideration of victim impact evidence; by overruling his objection that the jury charge unduly limited what factors the jury could consider as mitigating; by overruling his objection that the mitigation special issue is unconstitutional for failing to assign a burden of proof and for not being susceptible to a sufficiency review on appeal; and by refusing to instruct the jury that there is a presumption in favor of a life sentence.  Appellant also contends that the imposition of the death penalty violates his right, under the Eighth and Fourteenth Amendments, not to be subjected to cruel and unusual punishment.

Appellant concedes that there is authority against all of these contentions.  We have rejected all of these claims explicitly or have rejected claims similar enough to be covered by our holdings.[165]

---

[165]  *See Jenkins v. State*, 493 S.W.3d 583, 613-18 (Tex. Crim. App. 2016) (rejecting claim that jury had to be instructed on the effect of a failure to agree its answers to a special issue despite the statutory 10-12 rule; rejecting claim that trial court should have given the four requested instructions on victim impact advanced here; rejecting claims that the trial court erred in failing to define "probability," "criminal acts of violence," "militates," and "continuing threat to society"; rejecting claim that special issues needed to be considered by the grand jury and included in the indictment); *Davis v. State*, 313 S.W.3d 317, 354-55 (Tex. Crim. App. 2010) (rejecting claims that the trial court erred in failing to define "personal moral culpability," "moral blameworthiness," and other terms; rejecting claim that mitigation special issue is unconstitutional by failing to assign a burden of proof); *Gardner v. State*, 306 S.W.3d at 303 (rejecting claim that jury should have been instructed on a presumption in favor of a life sentence); *Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009) (rejecting contention that death penalty, as presently administered in Texas, amounts to cruel and unusual punishment); *Russeau v. State*, 291 S.W.3d 426, 437 (Tex. Crim. App. 2009) (rejecting claim that death penalty scheme is unconstitutional for failing to provide a meaningful sufficiency review of mitigation issue); *Saldano v. State*, 232 S.W.3d 77, 105 (Tex. Crim. App. 2007) (rejecting claim that statutory punishment instructions fail "to provide a rational basis to permit a discretionary grant of mercy based on mitigating circumstances"); *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007) (rejecting claim that mitigation special issue unconstitutionally narrowed mitigating evidence to that which reduced moral blameworthiness); *Prible v. State*, 175 S.W.3d 724, 737 (Tex. Crim. App. 2005) (rejecting complaint about anti-sympathy instruction).

In his argument that the death penalty is cruel and unusual punishment, appellant cites to Justice Breyer's recent dissent in *Glossip v. Gross*, but we are not at liberty to follow a dissent, even from a Supreme Court justice, in construing the Eighth Amendment.[166] Moreover, we have held that it is sufficient to dispose of these types of death-penalty challenges "by recognizing that the trial court submitted a charge consistent with the applicable state statutes, which have withstood numerous constitutional challenges."[167] Points of error twelve through twenty-six are overruled.

## VI. JUDGMENT ISSUES

In point of error twenty-eight, appellant contends that the judgment should be modified to reflect that he was convicted of a capital felony rather than a first degree felony. The State does not oppose relief on this claim.

Under the heading "Degree of Offense," the judgment specifies, "1ST DEGREE FELONY." Capital murder is a capital felony, not a first degree felony.[168] Point of error twenty-eight is sustained. We order that the judgment be modified to reflect the degree of offense as a "CAPITAL FELONY."

In point of error twenty-nine, appellant contends that the judgment should be modified to reflect that punishment was assessed by the trial court rather than by the jury. Under the heading,

---

[166] *Janecka v. State*, 937 S.W.2d 456, 475 (Tex. Crim. App. 1996) ("[A]ppellant urges us to adopt Justice Blackmun's dissenting opinion in *Callins v. Collins*, 510 U.S. 1141 (1994), to hold that the tensions between the requirements of well defined death eligibility and open-ended consideration of mitigating evidence are irreconcilable and render capital punishment unconstitutional. Of course we are not at liberty to do so—at least not for purposes of construing the Eighth Amendment. Referring instead to the authoritative, contrary holdings of" the Supreme Court, "we must overrule" the appellant's claim.)

[167] *Davis*, 313 S.W.3d at 355 (quoting *Saldano*, 232 S.W.3d at 107).

[168] *See* TEX. PENAL CODE § 19.03(b). *See also id.* §§ 12.04, 12.31.

"Punishment Assessed by," the judgment specifies, "JURY." Appellant contends that, although the jury answered the punishment special issues, the trial judge actually assessed punishment. We disagree. If the jury makes the findings required to impose the death penalty, statute provides that "the court shall sentence the defendant to death."[169] The use of the verb "sentence" here is a reference to the imposition of sentence, not to the assessment of sentence.[170] Despite loose language in some of our appellate opinions,[171] the trial judge never assesses a death sentence. The jury indirectly assesses a death sentence by answering the special issues in a way that requires the judge to impose the death sentence.[172] The notation that punishment was assessed by the jury in this case is more accurate than saying that it was assessed by the trial court, and we decline appellant's invitation to change it. Point of error twenty-nine is overruled.

---

[169] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[170] See Wright v. State, 506 S.W.3d 478, 481 (Tex. Crim. App. 2016), for an example of the difference between sentence being assessed and sentence being imposed.

[171] See Leal v. State, 303 S.W.3d 292, 294 (Tex. Crim. App. 2009) ("The jury found appellant 'guilty of capital murder as charged in the indictment' and answered the special issues in such a manner that the trial court assessed a sentence of death."); Ex parte Alba, 256 S.W.3d 682, 683 (Tex. Crim. App. 2008) (similar language); Ex parte Kerr, 64 S.W.3d 414, 415 (Tex. Crim. App. 2002) (similar language); Robison v. State, 888 S.W.2d 473, 475 (Tex. Crim. App. 1994); Johnson v. State, 853 S.W.2d 527, 529 (Tex. Crim. App. 1992).

[172] See Hartfield v. Thaler, 403 S.W.3d 234, 238 (Tex. Crim. App. 2013) (Under pre-1987 law, the defendant received a complete new trial rather than a new trial on punishment only in a capital case because that was the law "when punishment was assessed by a jury and a new trial was awarded on the basis of punishment error." We also quoted Judge Onion's statement in Whan v. State, 485 S.W.2d 275, 278 (Tex. Crim. App. 1972) (Onion, J., dissenting), that, "A jury alone may assess the death penalty."). See also Holberg v. State, 425 S.W.3d 282, 283 (Tex. Crim. App. 2014) ("The jury found the appellant guilty as charged in the indictment and assessed a sentence of death."); Hammett v. State, 578 S.W.2d 699, 702 (Tex. Crim. App. 1979) ("The jury returned an affirmative finding to each special issue submitted under Article 37.071(d), V.A.C.C.P., and accordingly punishment was assessed at death.").

## VII. DISPOSITION

We modify the trial court's judgment to reflect that the degree of offense for which appellant was convicted was a "capital felony" and otherwise affirm the trial court's judgment.

Delivered: March 8, 2017

Publish